

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-1997

# In Re: Burlington

Precedential or Non-Precedential:

Docket 96-5187

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"In Re: Burlington" (1997). *1997 Decisions.* Paper 127.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/127

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 10, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-5187

IN RE BURLINGTON COAT FACTORY
SECURITIES LITIGATION

P. GREGORY BUCHANAN, JACOB TURNER AND
RONALD ABRAMOFF,
Appellants

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civil Nos. 94-04663, 94-04737, 94-04751)

Argued: December 12, 1996

Before: GREENBERG, ALITO, and ROTH, Circuit Judges.

(Opinion Filed: June 10, 1997)

Jeffrey W. Golan (argued)
Leonard Barrack
Gerald J. Rodos
Robert A. Hoffman
BARRACK, RODOS & BACINE
3300 Two Commerce Street
2001 Market Street
Philadelphia, PA 19103

David J. Bershad
Sharon Levine Mirsky
Edith M. Kallas
MILBERG WEISS BERSHAD HYNES
 & LERACH, LLP
One Pennsylvania Plaza
49th Floor
New York, NY 10119

Howard D. Finkelstein
FINKELSTEIN & ASSOCIATES
600 B Street
Suite 1400
San Diego, CA 92101

Alfred G. Yates, Jr.
ALFRED G. YATES, JR. &
 ASSOCIATES
429 Forbes Avenue, Room 519
Allegheny Building
Pittsburgh, PA 15219

Attorneys for Appellants

2

Robert A. Alessi (argued)
CAHILL GORDON & REINDEL
Eighty Pine Street
New York, NY 10005

John L. Thurman
MASON, GRIFFIN & PIERSON, P.C.
101 Poor Farm Road
Princeton, New Jersey 08540

Attorneys for Appellees

**OPINION OF THE COURT**

ALITO, Circuit Judge:

Burlington Coat Factory Warehouse Corporation ("BCF "), a Delaware corporation based in New Jersey, announced its fourth quarter and full fiscal year results for 1994 on September 20, 1994. The results were below the investment community's expectations, and BCF's common stock fell sharply, losing approximately 30% in one day. Within a day of the initial announcement, the first investor suit was filed. In the next few days, the company made additional explanatory disclosures, and the stock price fell even further. More investor suits were filed. The action at hand is the product of the consolidation of these suits.

BCF and certain of its principal officers and directors were sued under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). 15 U.S.C. §§ 78j(b), 78t(a). Section 10(b) provides a broad prohibition on the use of "manipulative or deceptive devices" in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). Section 20, in turn, provides liability for "controlling persons." 15 U.S.C. § 78t(a). Plaintiffs assert that they represent the class of investors who purchased BCF common stock between October 4, 1993, and September 23, 1994. Plaintiffs claim that, as a result of BCF's misleading statements and omissions during the class period, the company's stock price was artificially inflated.

3

The district court dismissed the case both for failure to state claims on which relief could be granted and for failure to plead those claims with adequate particularity. The court also denied plaintiffs' request that they be allowed to amend and replead their claims in the event of a dismissal.

On appeal, plaintiffs challenge the dismissal of four of their six original claims. Since the fourth claim has two distinct parts, we describe the four claims as five. According to plaintiffs, the district court erred in ruling: (1) that the alleged earnings overstatements during fiscal year 1994 were not materially misleading because no violation of GAAP had been shown and that, in any event, the claim stated was, at most, a claim for negligence; (2) that the failure to disclose that the company had not received its usual discounts in its inventory build-up in January and February of 1994 was "largely irrelevant"; (3) that overstatements regarding the sales attributable to an extra, 53rd week in 1993 were not actionable; (4) that management's expression of "comfort" with certain specific earnings forecasts by analysts was not actionable because BCF did not "adopt" the analysts' estimates; and (5) that a statement that the company's earnings would continue to grow faster than revenues was not actionable because it was no more than "puffery." Plaintiffs argue that these were proper, viable claims under Section 10(b) and that they pled facts in support of their claims that met the particularity requirements for fraud claims. As a final matter, plaintiffs contend that even if the district court's dismissal of their claims on particularity grounds was justified, they should have been given leave to amend and replead their claims.

We affirm the district court's dismissals on claims (2), (3), and (5). Claims (1) and (4) were properly dismissed on particularity grounds, but we disagree with the district court's holding that these claims could not be viable. Since leave to amend appears to have been denied on the grounds of futility alone, we hold that plaintiffs may amend their complaint and replead claims (1) and (4).

I.

BCF is one of the leading retailers of coats in the United States. Its specialty is selling brand name clothes at

4

discount prices. By mid-1993, BCF was operating a total of 185 stores in 39 states. The stores ranged in size from 16,000 to 133,000 square feet and featured outerwear (coats, jackets, and raincoats) and complete lines of clothing for men, women, and children.

BCF opened in 1924, under the management of Abe Milstein, and specialized in wholesale outerwear. In the 1950's, Abe's son, Monroe, joined the business. In 1972, BCF acquired a coat factory and outlet store in Burlington, New Jersey, and began operation as a retailer.

BCF is a public company traded on the New York Stock Exchange. During the class period for this case, the average daily trading volume for BCF common stock was 100,000 shares. Plaintiffs assert that BCF's securities are actively followed by numerous analysts and that the market in BCF stock was "efficient" at all periods relevant to this case.[1]

BCF's fortunes have been on the rise over the past decade. BCF's 1992 Annual Report stated that "[t]he Company's revenues have increased each year for the past 13 years, from $24 million in 1978 to over $1 billion in 1992." Further, BCF's earnings per share rose from $0.60 in 1990 to $1.06 in 1993.

BCF's top corporate officers, some of whom are defendants in this case, hold large portions of BCF's outstanding common stock. This seems especially true of those officers who are members of the Milstein family, which as a whole owned approximately 55% of BCF's common stock.[2]

---

1. Asserting that the market in BCF's stock was "efficient" is relevant to plaintiffs, such as those here, who are attempting to use the "fraud on the market" theory to satisfy the reliance requirement in a Section 10(b) claim. See, e.g., Daniel R. Fischel, Efficient Capital Markets, The Crash, and the Fraud on the Market Theory, 74 Cornell L. Rev. 907, 908-12 (1989) (describing both the "fraud on the market" theory and its link to the efficient market hypothesis); Jonathan Macey, et al., Lessons From Financial Economics: Materiality, Reliance, and Extending the Reach of Basic v. Levinson, 77 Va. L. Rev. 1017 (1991); see also n.8, infra.

2. As of May 11, 1994, there were 41,119,463 shares of BCF's common stock outstanding. The stock ownership figures and percentages are those alleged in the Complaint.

The defendant-officers are: (1) Monroe G. Milstein, BCF's chief executive officer and chairman of the board, who owned approximately 30.7% of the stock; (2) Stephen E. Milstein, a vice-president, director, and general merchandise manager, who owned approximately 4.9% of the stock; (3) Andrew R. Milstein, a vice-president, director, and executive merchandise manager, who owned approximately 5.4% of the stock; (4) Robert R. LaPenta, controller, and chief accounting officer; and (5) Mark A. Nesci, vice-president for store operations, director, and chief operating officer.

This case was brought as a class action on behalf of all purchasers of BCF common stock during the period from October 4, 1993, through and including September 23, 1994.[3] Plaintiffs claim that during this period defendants (the company and the individual officer-defendants), through a number of misstatements in and omissions from disclosures made to the public, defrauded plaintiffs into purchasing BCF stock at artificially high prices.

Plaintiffs explain that the individual defendants, as a result of their positions of control in the company, were able to manipulate BCF's press releases and other disclosures so as to deceive the market into overpricing the company's stock. Allegedly, the individual defendants behaved in this manner so as to:

(i) artificially inflate and maintain the market price of BCF's common stock during the Class Period and thereby cause plaintiffs and the other members of the Class to purchase such common stock at artificially inflated prices and, in the case of certain of the defendants, to personally gain from the sale of inflated stock; and

(ii) protect, perpetuate and enhance their executive positions and the substantial compensation, prestige and other perquisites of executive compensation obtained thereby.

---

3. Excluded from the class are defendants, their immediate families, the officers, directors, and affiliates of BCF, members of their immediate families, and any trusts or entities which they control.

6

Complaint, ¶ 15.

Defendants who are alleged to have personally gained from selling their stock during the class period are Andrew R. Milstein (who sold 10,000 shares on March 17 and March 21, 1994, at $27.75 per share), Mark A. Nesci (who sold 10,000 shares on March 18 and March 25, 1994, at $27.50), and Robert R. LaPenta (who sold 1,500 shares on March 4, 1994 at $28.00 per share and 2,500 shares on April 6, 1994, at $26.25 per share). The price drop between September 20 and September 23, 1994 -- the days of the announcements that allegedly caused a correction in the stock price to reflect the true state of BCF's fortunes -- was from a high of $23.25 to a low of $13.63. Assuming that the price drop of approximately $10 was due entirely to the correction of false information, Andrew Milstein's and Mark Nesci's trading gains would each amount to approximately $100,000, and Robert LaPenta's gains would be approximately $40,000.

II.

On September 20, 1994, BCF reported its year-end revenues and earnings for fiscal 1994. These results were below the market's expectations, with the earnings per share for fiscal 1994 being $1.12 as compared to the $1.37 that analysts had been predicting. On September 20 itself, the price of BCF stock fell almost 30%, from $23.25 to $15.75 per share. Between September 20 and September 23 both BCF and outside analysts attempted to explain the reasons for the worse-than-expected results. By the close of the market on September 23, 1994, the price of BCF stock had fallen to $13.63.

The first of plaintiffs' three suits was filed within a day of the first price drop on September 20, alleging that BCF had violated Sections 10(b) and 20(a) of the Exchange Act. Two other similar actions were filed two days later, on September 23, 1994. The three actions were consolidated, and the consolidation resulted in the filing, in January 1995, of the "Consolidated Amended and Supplemental Class Action Complaint" (the "Complaint").

Defendants moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief could be granted and under Federal Rule of Civil Procedure 9(b) for failure to plead fraud with particularity.

The district court determined that the Complaint contained six distinct claims:

First, plaintiffs allege that BCF's 1993 annual report misrepresented the impact of an additional week (the "fifty-third week") on the fiscal year-end sales revenue. . . .

Second, plaintiffs allege that defendants failed to announce that the discounts BCF received on merchandise purchased for January, 1994, and February, 1994, were substantially less than the discounts received in previous years. . . .

Third, plaintiffs claim that "during each quarter during the Class Period, defendants overstated BCF's profits from operations by 2-3 cents EPS (earnings per share) per quarter by failing to properly match their operating expenses with sales." . . .

Fourth, plaintiffs allege that defendants, in a press release of March 1, 1994, stated that BCF's store expansion program would be internally funded, when, in truth, BCF was borrowing heavily to fund that expansion. . . .

Fifth, plaintiffs claim that defendants, in promoting the store expansion program, asserted in various reports . . . that 95% of all new stores were profitable within six months, and that the new stores were opened efficiently and without great expense. . . .

Finally, plaintiffs allege that throughout the putative class period, defendants championed their growth in revenue, profit margins and earnings, but did not disclose shortcomings in their accounting and cost control systems.

(Dist. Ct. Op. at 3).

8

On February 20, 1996, the district court dismissed plaintiffs' claims pursuant to Rules 12(b)(6) and 9(b). Plaintiffs had requested leave to amend should the Complaint be dismissed, but the district court dismissed the action in its "entirety."

Plaintiffs then took this appeal. Plaintiffs contest the district court's dismissal of four of the six claims.[4] Plaintiffs also challenge the court's denial of their request for leave to amend.

III.

A. Section 10(b) Claims

Plaintiffs assert claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The private right of action under Section 10(b) and Rule 10b-5[5] reaches beyond statements and omissions made in a registration statement or prospectus or in connection with an initial distribution of securities and creates liability for false or misleading statements or omissions of material fact that affect trading on the secondary market. See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 171 (1994); Shaw v. Digital Equip.

_____

4. The claims abandoned on appeal are (1) that BCF, by stating that the company " `[c]ontinue[s] to anticipate funding most of [its] growth through internal profits[,]' " misrepresented "that BCF's store expansion program would be internally funded, when in truth BCF was borrowing heavily to fund that expansion" and (2) that "defendants, in promoting the store expansion program, [misrepresented] . . . that 95% of all new stores were profitable within six months, and that the new stores were opened efficiently and without great expense."

5. Section 10(b) prohibits the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Rule 10b-5, in turn, makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b).

9

Corp., 82 F.3d 1194, 1216-17 (1st Cir. 1996); Eckstein v. Balcor Film Investors, 8 F.3d 1121, 1123-24 (7th Cir. 1993).

The first step for a Rule 10b-5 plaintiff is to establish that defendant made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading. See In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1243 (3d Cir. 1989); Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1018 (5th Cir. 1996). Next, plaintiff must establish that defendant acted with scienter and that plaintiff's reliance on defendant's misstatement caused him or her injury. See Phillips, 881 F.2d at 1244; San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos., Inc., 75 F.3d 801, 808 (2d Cir. 1996). Finally, since the claim being asserted is a "fraud" claim, plaintiff must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). See Suna v. Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This particularity requirement has been rigorously applied in securities fraud cases. See Suna, 107 F.3d at 73; Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st Cir. 1996). For example, where plaintiffs allege that defendants distorted certain data disclosed to the public by using unreasonable accounting practices, we have required plaintiffs to state what the unreasonable practices were and how they distorted the disclosed data. See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284-85 (3d Cir. 1992). Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements. See Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). Despite Rule 9(b)'s stringent requirements, however, we have stated that "courts should be `sensitive' to the fact that application of the Rule prior to discovery `may permit sophisticated defrauders to successfully conceal the details of their fraud.' " Shapiro, 964 F.2d at 284 (citing Christidis v. First

10

Pa. Mortgage Trust, 717 F.2d 96, 99 (3d Cir. 1983)). Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control. See Shapiro, 964 F.2d at 285. But even under a relaxed application of Rule 9(b), boilerplate and conclusory allegations will not suffice. Id. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible. Id.

Rule 9(b) also says that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." The meaning of this sentence has been the source of considerable debate. The Second Circuit, among others, has emphasized that although state of mind may be "averred generally," a plaintiff alleging securities fraud must still allege specific facts that give rise to a "strong inference" that the defendant possessed the requisite intent. See, e.g., Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995); see also Suna, 107 F.3d at 68; Tuchman, 14 F.3d at 1068. "The requisite `strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Acito, 47 F.3d at 52; see also Dileo v. Ernst & Young, 901 F.2d 624, 629 (7th Cir. 1990) ("People sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud").

By contrast, the Ninth Circuit has rejected such a requirement that plaintiff allege facts from which intent to commit fraud may be inferred. See In re GlenFed, Inc. Sec. Litig., 42 F.3d 1541 (9th Cir. 1994) (in banc). In GlenFed, the court argued that since the second sentence of Rule 9(b) states that "malice, intent, knowledge, and other condition of mind may be averred generally," the Rule leaves no room for requiring specific facts to be pled. Id. at 1545-47.

We agree with the Second Circuit's approach. Cf. In re ValueVision Int'l, Inc., Sec. Litig., 896 F. Supp. 434, 446 (E.D. Pa. 1995) (noting the Third Circuit's silence on the issue). While state of mind may be averred generally,

11

plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with "scienter." Otherwise, strike suits based on no more than plaintiffs' detection of a few negligently made errors in company documents or statements (errors detected in the aftermath of a stock price drop) could survive the pleading threshold and subject public companies to unneeded litigation expenditures. Public companies make large quantities of information available to the public, as a result of both mandatory disclosure requirements and self-initiated voluntary disclosure. Cf. Roberta Romano, The Genius of American Corporate Law 93-95 (1993). Large volumes of disclosure make for a high likelihood of at least a few negligent errors. To allow plaintiffs and their attorneys to subject companies to wasteful litigation based on the detection of a few negligently made errors found subsequent to a drop in stock price would be contrary to the goals of Rule 9(b), which include the deterrence of frivolous litigation based on accusations that could hurt the reputations of those being attacked.[6] See Tuchman, 14 F.3d at 1067; In re Discovery Zone Sec. Litig., 943 F. Supp. 924, 934 (N.D. Ill. 1996).

Plaintiffs' Complaint advances numerous claims of nondisclosure and misstatement. On appeal, the myriad allegations have been whittled down to five: (1) that BCF overstated certain quarterly earnings reports; (2) that BCF wrongfully failed to disclose the receipt of certain reduced discounts on purchases; (3) that BCF misrepresented the sales attributable to the 53rd week of 1993; and (4) & (5) that BCF made certain forward-looking statements without

_____

6. The parties do not contend that the recently enacted Private Securities Litigation Reform Act of 1995 (the "Reform Act") applies to this case. Cf. Hockey v. Medhekar, 1997 WL 203704, *3-4 (N.D. Cal.) (holding that the Reform Act applies only to class actions filed after December 22, 1995). We note, however, that Section 21(D)(b)(2) of the Reform Act requires that complaints brought under Rule 10b-5 "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2); see also Friedberg v. Discreet Logic, Inc., 1997 WL 109228, *5 (D. Mass.); John C. Coffee, Jr., The Future of the Private Securities Litigation Reform Act: Or, Why the Fat Lady Has Not Yet Sung, 51 Bus. Law. 975, 978-79 (1996).

12

a reasonable basis.7 Plaintiffs have further alleged that the nondisclosures and misstatements were made with fraudulent intent, that defendants' conduct artificially inflated the market price of BCF stock, and that this fraud on the market caused plaintiffs to suffer damages.8

---

7. Under existing law, where purchasers or sellers of stock have been able to identify a specific false representation of material fact or omission that makes a disclosed statement materially misleading, a private right of action lies under Section 10(b) and Rule 10b-5. See Hayes v. Gross, 982 F.2d 104, 106 (3d Cir. 1992). Plaintiffs, however, did not merely assert that defendants made affirmative misstatements in and omissions from disclosed statements. They also alleged that defendants had failed to comply with affirmative disclosure requirements under "Item 303 of Regulation S-K." Complaint, ¶ 12. Plaintiffs tell us that under Item 303 defendants had a duty to "report all trends, demands or uncertainties that were reasonably likely to (i) impact BCF's liquidity; (ii) impact BCF's net sales, revenue and/or income; and/or (iii) cause previously reported financial information not to be indicative of future operating results." Complaint, ¶ 12; see also 17 C.F.R. § 229.303.

It is an open issue whether violations of Item 303 create an independent cause of action for private plaintiffs. See Shaw, 82 F.3d at 1222 (declining to reach the issue); In re Wells Fargo Sec. Litig., 12 F.3d 922, 930 n.6 (9th Cir. 1993) (same); In re Canandaigua Sec. Litig., 944 F. Supp. 1202, 1209 n.4 (S.D.N.Y. 1996) ("far from certain that the requirement that there be a duty to disclose under Rule 10b-5 may be satisfied by importing the disclosure duties from S-K 303").

We do not need to reach this issue, however, because it has not been raised on appeal.

8. The "fraud on the market" theory accords plaintiffs in Rule 10b-5 class actions a rebuttable presumption of reliance if plaintiffs bought or sold their securities in an "efficient" market. See Donald C. Langevoort, Theories, Assumptions and Securities Regulation: Market Efficiency Revisited, 140 U. Pa. L. Rev. 851, 889-91 (1992); see also Shaw, 82 F.3d at 1218. Plaintiffs using this theory need not show that they actually knew of the communication that contained the misrepresentation or omission. Instead, plaintiffs are accorded the presumption of reliance based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance. See Basic, Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (theory presumes that the plaintiffs relied on market integrity to accurately and adequately incorporate the company's value into the price

13

Defendants counter that none of the statements or omissions identified by plaintiffs was materially false, misleading, or otherwise actionable. Defendants protest that:

This lawsuit constitutes a frivolous attempt by appellants to extort money from a healthy, successful company that saw its revenues and earnings per share increase steadily from fiscal 1990 through fiscal 1994. The Company's only alleged sin is to have reported accurately on September 20, 1994 its year-end revenues and earnings for fiscal 1994, which, while surpassing the performance of any prior year in its history, failed to meet the earnings-per-share projections of a handful of bullish securities analysts.

(Appellees' Br. at 18) (internal citations omitted). We address each of plaintiffs' claims in turn.

(1) Earnings Overstatements

Plaintiffs allege that "during each quarter during the Class Period, defendants overstated BCF's profits from operations by 2-3 cents [earnings per share] per quarter by failing to properly match their operating expenses with sales." Complaint, ¶ 73(c). The Complaint explains:

In order to achieve their goal of inflating the Company's stock price, defendants manipulated BCF's financial statements through improper and misleading accounting practices in violation of GAAP. Statement of Financial Accounting Concepts 6 (SFAC [No.] 6), set forth by the Financial Accounting Standards Board (FASB), provides that expenses -- which are defined as decreases in assets or increases in liabilities during a period resulting from delivery of goods, rendering of

---

of the security); see also Langevoort, Market Efficiency at 890-91. Therefore, in order to avail themselves of the fraud on the market theory and the benefit of not having to plead specific reliance on the alleged misstatement or omission, plaintiffs have to allege that the stock in question traded on an open and efficient market. See Hayes v. Gross, 982 F.2d 104, 107 (3d Cir. 1992); Peil v. Speiser, 806 F.2d 1154, 1161 (3d Cir. 1986). It is undisputed that plaintiffs have met this burden.

14

services, or other activities constituting the enterprise's central operations -- must be matched with revenues resulting from those expenses. See SFAC[No.] 6 [ ]. The matching principle requires that all expenses incurred in the generating of revenue should be recognized in the same accounting period as the revenues are recognized. Defendants violated SFAC [No.] 6 by failing to properly account for the expenses associated with BCF's purchases of inventory during the Class Period, and thereby artificially inflated the reported net income and earnings per share during the first, second and third quarters of fiscal year 1994. Because of the Company's inadequate financial and accounting controls, defendants were able to and did, in fact, . . . materially understate BCF's expenses, on a quarter-by-quarter basis during fiscal year 1994, and thereby overstate very significantly during the Class Period BCF's profitability, earnings and prospects for fiscal year 1994.

Complaint, ¶ 67 (emphasis added).

The court dismissed the earnings overstatement claim because it "fail[ed] to allege how defendants intentionally or recklessly deviated from generally accepted accounting principles." (Dist. Ct. Op. at 19). Although defendants argued that plaintiffs had failed to state a legally cognizable claim because they did not point to a violation of GAAP, the district court's decision to dismiss this claim is most easily read as being on Rule 9(b) grounds alone, i.e., a failure to plead with particularity. However, to read the district court's opinion as dismissing the claim under Rule 9(b) alone would be inconsistent with the court's simultaneous failure to grant leave to amend on the ground of futility. See Section B, infra. Hence, we review the district court's dismissal as if it were based on both Rule 12(b)(6) and Rule 9(b). In evaluating the Rule 12(b)(6) dismissal we assume that the district court accepted defendants' arguments on the issue.

(i) Rule 12(b)(6)

Defendants argue here, as they did before the district court, that the earnings overstatement claim fails under

15

Rule 12(b)(6). A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief. Bartholomew v. Fischl, 782 F.2d 1148, 1152 (3d Cir. 1986). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

Defendants argue that their earnings statements could not have been materially misleading because BCF's accounting practices were consistent with GAAP.[9] Defendants assert that violations of mere accounting "concepts" such as SFAC No. 6, which is what plaintiffs have alleged, are not violations of GAAP, and therefore are not enough to give rise to disclosure violations under the securities laws.[10] Defendants suggest that the earnings

_____

9. Defendants do not attempt to suggest that the alleged earnings per share overstatements of 2-3 cents themselves should be ruled immaterial. Indeed, earnings reports are among the pieces of data that investors find most relevant to their investment decisions. In deciding whether to buy or sell a security, reasonable investors often rely on estimates or projections of the underlying firm's future earnings. See Wielgos v. Commonwealth Edison Co., 892 F.2d 509, 514 (7th Cir. 1989). Information concerning the firm's current and past earnings is likely to be relevant in predicting what future earnings might be. See Glassman v. Computervision Corp., 90 F.3d 617, 626 (1st Cir. 1996). Thus, information about a company's past and current earnings is likely to be highly "material." Cf. Louis Lowenstein, Financial Transparency and Corporate Governance: You Manage What You Measure, 96 Colum. L. Rev. 1335, 1355 (market places an "enormous emphasis" on earnings reports); Victor Brudney and William W. Bratton, Corporate Finance A-1 (1993) ("The issuance of an income statement is often preceded or followed by increased market activity in the company's shares.").

10. GAAP is not a set of rigid rules ensuring identical treatment of identical transactions, but rather characterizes the range of reasonable alternatives that management can use. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 544 (1979); Lovelace v. Software Spectrum, Inc., 78 F.3d 1015, 1021 (5th Cir. 1996). "GAAP [is] an amalgam of statements issued by the [American Institute of Certified Public Accountants] through the successive groups it has established to promulgate accounting principles: the Committee on Accounting

16

overstatement claim is based on no more than the fact that BCF uses one accounting method to value merchandise on a quarterly basis (the "gross profit" method) and a different method to value its merchandise on an annual basis (the "retail inventory" method). In addition, defendants inform us that the market knew about this practice because the use of the different methods was disclosed to investors in BCF's quarterly 10-Q filings with the SEC.

If BCF is correct (a) that the alleged overstatements of quarterly earnings are merely the result of the use of valid, accepted, and understood accounting methods, and (b) that this concurrent use of different accounting methods was fully and adequately disclosed to the market (alleged here to be efficient), plaintiffs' claims would likely fail. However, at this stage, we cannot say, as a matter of law, that the alleged earnings overstatements can be fully explained by BCF's use of different accounting methods for analyzing quarterly versus annual data (even assuming that these were fully disclosed to the market). Moreover, assuming that consistency with GAAP is enough to preclude liability, it is a factual question whether BCF's accounting practices were consistent with GAAP. Cf. Discovery, 943 F. Supp. at 935 n.9 ("This Court finds that whether FASB[SFAC] No. 6 constitutes GAAP is best resolved by expert testimony, and thus should not be addressed on a motion to dismiss"); cf. also In re Westinghouse Sec. Litig., 90 F.3d 696, 709 n.9 (3d Cir. 1996). And, of course, since the claim at issue was dismissed at the pleading stage, we are required to credit

_____

Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board [(FASB)]. . . . GAAP include[s] broad statements of accounting principles amounting to aspirational norms as well as more specific guidelines and illustrations. The lack of an official compilation allows for some debate over whether particular announcements are encompassed within GAAP." Bily v. Arthur Young & Co., 834 P.2d 745, 750-51 (Cal. 1992); see also Providence Hosp. of Toppenish v. Shalala, 52 F.3d 213, 218 n.7 (9th Cir. 1995). At issue here is SFAC No. 6, which although issued by FASB, is allegedly not GAAP -- at least according to defendants. But cf. Anthony Phillips et al., Basic Accounting for Lawyers 39 (4th ed. 1988) (including FASB's Statements of Financial Concepts within its table of "Sources of Generally Accepted Accounting Principles").

17

plaintiffs' allegations rather than defendants' responses. See, e.g., Westinghouse, 90 F.3d at 706 ("we must accept as true plaintiffs' factual allegations, and we may affirm the district court's dismissals only if it appears certain that plaintiffs can prove no set of facts entitling them to relief") (citation omitted). Consequently, we cannot sustain the district court's dismissal of this claim under Rule 12(b)(6).

(ii) Rule 9(b)

The district court specifically ruled that the earnings overstatement claim failed the particularity requirements of Rule 9(b). Rule 9(b) requires a plaintiff to plead here (1) a specific false representation of material fact, (2) knowledge of its falsity by the person who made it, (3) ignorance of its falsity by the person to whom it was made, (4) the maker's intention that it should be acted upon, and (5) detrimental reliance by the plaintiff. Westinghouse, 90 F.3d at 710. The district court held that plaintiffs did not comply with Rule 9(b) because they failed to allege:

how defendants intentionally or recklessly deviated from generally accepted accounting principles. The Amended Consolidated Complaint is devoid of any indication as to the particular error(s), [and/or] the standard(s) from which defendants deviated and even the allegation of scienter.

(Dist. Ct. Op. at 19) (emphasis added). The court concluded that plaintiffs had offered no more than "rote allegations of fraud predicated on the drop in price of BCF stock," and that these allegations fell below the "who, what, when, where and how" elements necessary to establish an intentional or reckless misstatement or omission under Rule 9(b). (Dist. Ct. Op. at 19). See Dileo, 901 F.2d at 627 (equating the particularity required by Rule 9(b) with "the first paragraph of any newspaper story"). In addition, according to the court, plaintiffs' claim sounded in "negligence." (Dist. Ct. Op. at 18).

We disagree that plaintiffs' claim, at this stage, boils down to a blanket assertion of fraud premised on no more than a drop in stock price.11 Plaintiffs have alleged that 2-3

_____

11. The issue is not whether there was a deviation from any set of formal accounting practices, but whether BCF's earnings statements were

18

cent overstatements of earnings occurred in the company's public announcements of results for the first, second, and third quarters of 1994 and that these overstatements occurred because BCF failed to account properly for expenses associated with purchases of inventory and thereby violated a specific accounting concept: SFAC No. 6. This is an adequate allegation of "how" BCF overstated its earnings, so we cannot say that plaintiffs have failed to state their claim with adequate particularity. Cf. Westinghouse, 90 F.3d at 711 (where plaintiffs alleged that defendant had arbitrarily moved loans from non-earning to earning status just before mandated public reporting, when nothing had changed regarding the likelihood of collection on the loans, allegations were adequate under Rules 12(b)(6) and 9(b)).

The district court also ruled that plaintiffs inadequately pled scienter. Here, we agree. To satisfy the scienter requirement, plaintiffs "must allege facts that give rise to an inference that [BCF] knew or was reckless in not knowing that [BCF's] financial statements" were misleading. Id. at 712. It is not enough for plaintiffs to allege generally that defendants "knew or recklessly disregarded each of the false and misleading statements for which [they were] sued," Complaint, ¶ 16; plaintiffs must allege facts that could give rise to a "strong" inference of scienter. Suna, 107 F.3d at 68; San Leandro, 75 F.3d at 813-14. Plaintiffs must either (1) identify circumstances indicating conscious or reckless behavior by defendants or (2) allege facts showing both a motive and a clear opportunity for committing the fraud. San Leandro, 75 F.3d at 813.

In this case, plaintiffs have failed to allege facts that would constitute circumstantial evidence of reckless or conscious misbehavior on the part of defendants in making the overstatements of earnings. Cf. id. at 812-13 (describing

---

materially misleading. Deviations from accounting standards are important insofar as reasonable investors expect those standards to be followed. Given that the market expects that a certain set of accounting standards will be followed, we imagine that a demonstration of explicit compliance with these standards will at least generally negate the possibility that reasonable investors were misled.

19

the types of allegations of fact that would indicate conscious or reckless behavior).

Plaintiffs have also endeavored to plead scienter by alleging facts that point towards motive and opportunity to commit fraud. Plaintiffs have alleged (and it is undisputed) that the individual defendants were top officers of BCF and hence had the opportunity to manipulate BCF's disclosures to the public. Id. at 813. In addition, plaintiffs have alleged that defendants artificially inflated the price of BCF's stock so as to enable certain top BCF officials to sell portions of their stock holdings at these prices.12 See Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995) ("Plaintiffs may plead scienter by alleging `facts establishing a motive to commit fraud and an opportunity to do so,' or alleging `facts

_____

12. Plaintiffs also allege, generally, that the individual officer-defendants sought to inflate the company's stock price so as to "protect, perpetuate and enhance their executive positions and the substantial compensation, prestige and other perquisites of executive employment obtained thereby." Complaint, ¶ 15. This general allegation, however, does not help plaintiffs in adequately alleging scienter because they fail to explain to us how a temporary inflation of BCF's stock price would help management increase its compensation or preserve its jobs. Cf. Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995) ("[T]he existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."); cf. also In re HealthCare Compare Corp. Sec. Litig., 75 F.3d 276, 284 (7th Cir. 1996); but cf. In re Wells Fargo Sec. Litig., 12 F.3d 922, 925 & 931 (9th Cir. 1993). An example of a situation in which management might be able to preserve its compensation and job security by causing a temporary stock price increase could be where the incumbent management fears a specific takeover bid and is seeking to deter the takeover (by causing the target company's stock price to be artificially inflated for a short period). See Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329, 1331 (7th Cir. 1995) (where plaintiffs articulated such a theory); see also HealthCare, 75 F.3d at 284. As a general matter, though, causing temporary inflations of price through the dissemination of false information hurts the long-term stock price of the company and thereby presumably hurts managerial compensation that may be tied to the long-term performance of the company. This is so because these disseminations of false information (that are eventually discovered by the market) increase the volatility of the company's stock and in turn increase its risk and long-term price. Cf. Marcel Kahan, Securities Laws and the Social Costs of "Inaccurate" Stock Prices, 41 Duke L. J. 977, 1025-26 (1992).

20

constituting circumstantial evidence of either reckless or conscious misbehavior.") (quoting In re Time Warner Sec. Litig., 9 F.3d 259, 269 (2d Cir. 1993)); see also Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1224 (1st Cir. 1996). In support of this theory, plaintiffs' Complaint provides us with the names of the insiders who sold stock, the quantities of stock sold and the prices at which the sales occurred, and the dates of the sales. Complaint, ¶ 51.

What these allegations boil down to is that two of the five officer-defendants made a profit of approximately $100,000 each and that a third officer-defendant made a profit of approximately $40,000 as a result of the artificial inflation of the price of BCF's stock. The two officer-defendants who are not alleged to have traded are Monroe Milstein, the CEO and chairman of the board, who owned 30.7% of BCF's stock, and Stephen Milstein, a vice-president and general merchandise manager, who owned 4.9% of the stock.

Of the three defendants who are alleged to have traded on nonpublic information, plaintiffs have provided us with the total stock holdings of only one defendant. This defendant, Andrew Milstein, owned 5.4% of the stock. The Complaint tells us that as of May 11, 1994, there were 41,119,463 shares of BCF's common stock outstanding. A 5.4% holding, therefore, translates to approximately 2,220,451 shares. Of these, Andrew Milstein is alleged to have profited on the sale of 10,000 shares, i.e., approximately 0.5% of his holdings. With respect to the other two officer-defendants who are alleged to have traded on the nonpublic information, the Complaint provides us with the number of shares they traded, but not what their total stock holdings were.

These allegations are inadequate to produce a "strong" inference of "fraudulent intent." See San Leandro, 75 F.3d at 814. First, two officer-defendants are not alleged to have traded at all, and these two defendants appear to be two of the more powerful among the group of five. One of them was the CEO, chairman of the board, and holder of over 30% of the stock. Second, the one defendant for whom we have information as to his total stock holdings appears to have sold no more than a minute fraction of his holdings, 0.5%. Further, we have no information as to whether such

21

trades were normal and routine for this defendant. Nor do we have information as to whether the profits made were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud. Finally, for two of the officer-defendants who are alleged to have traded during the class period, we do not even have information as to their total BCF stock holdings, and we therefore have even less of a basis to infer that their sales were unusual or suspicious. To the extent plaintiffs choose to allege fraudulent behavior based on what they perceive as "suspicious" trading, they have to allege facts that support that suspicion.

A large number of today's corporate executives are compensated in terms of stock and stock options. Cf. Elliott J. Weiss, The New Securities Fraud Pleading Requirement: Speed Bump or Road Block?, 38 Ariz. L. Rev. 675, 687 (1996). It follows then that these individuals will trade those securities in the normal course of events. We will not infer fraudulent intent from the mere fact that some officers sold stock. See Shaw, 82 F.3d at 1224; cf. Tuchman, 14 F.3d at 1068 (noting that if "incentive compensation" could be the basis for an allegation of fraud, "the executives of virtually every corporation in the United States would be subject to fraud allegations") (citation omitted). Instead, plaintiffs must allege that the trades were made at times and in quantities that were suspicious enough to support the necessary strong inference of scienter. See Shaw, 82 F.3d at 1224; see also Searls v. Glasser, 64 F.3d 1061, 1068 (7th Cir. 1995); cf. Weiss, Securities Fraud Pleading at 686-87 (question courts should ask is whether the benefits realized by executives as a result of the inflation in stock price are "sufficiently large to constitute evidence of motive" to commit fraud).

We conclude, therefore, that while dismissal on Rule 12(b)(6) alone would not have been proper, the dismissal on Rule 9(b) grounds was. We do not discard the possibility, however, that plaintiffs will be able to amend the Complaint to allege trading by the defendant-officers that adequately supports the requisite strong inference of scienter.

22

<u>(2) The 53rd Week</u>

Fiscal year 1993 for BCF contained an extra, 53rd week. In its 1993 annual report, filed with the SEC on October 4, 1993, BCF represented that this 53rd week had accounted for an increase of $12.2 million in sales. Specifically, the 1993 annual report stated:

Fiscal 1993 was a 53 week fiscal year compared with 52 week fiscal years in 1992 and 1991. Net sales for the 53rd week in fiscal 1993 amounted to $12.2 million.

(Dist. Ct. Op. at 15). According to plaintiffs, however, this statement was false when made. Claiming that the true increase in sales attributable to the 53rd week was <u>$23.2</u> million, not <u>$12.2</u> million, plaintiffs rely on the following statement made by BCF in a September 20, 1994, press release:

[T]he fourth quarter of 1994 was a 13 week quarter compared with a 14 week fiscal quarter in 1993. This extra week, a year ago, added $23.2 million in sales, and approximately $5 million in pre-tax profit, to 1993's fourth quarter.

(Dist. Ct. Op. at 15).

Plaintiffs claim that BCF's initial understatement of the effect of the 53rd week caused investors materially to overestimate BCF's future prospects. Complaint,¶ 35.

The two BCF statements on which plaintiffs rely appear to be inconsistent with respect to the effect of the 53rd week. The district court, however, found them consistent and consequently rejected plaintiffs' claim. The court explained:

The 1993 Annual Report and the September 20, 1994 press release compare two separate periods. The 1993 Annual Report focuses on the week of <u>June 27, 1993 to July 3, 1993</u> as the extra, non-comparable week between fiscal 1992 and fiscal 1993. That week, which was the fifty-third week in fiscal 1993, accounted for $12.2 million in sales. The September 20, 1994 press release, however, focuses on another week -- that of

23

<u>March 28, 1993 to April 3, 1993</u> -- as the non-comparable week between fifty-three-week fiscal 1993 and fiscal 1994, which had only fifty-two weeks.

(Dist. Ct. Op. at 16) (emphasis added; internal citations omitted).

Unlike the district court, we see nothing in the 1993 Annual Report or the September 20, 1994, press release that makes clear that the 53rd weeks discussed in the two documents were two different calendar weeks fromfiscal year 1993. As far as we can see, the only source of information before the district court that could have provided a basis for the conclusion it reached was defendants' brief in support of their motion to dismiss. Indeed, the district court's opinion specifically cites to an affidavit proffered by defendants on this point. (Dist. Ct. Op. at 16). However, since the district court was ruling on a motion to dismiss, it was not permitted to go beyond the facts alleged in the Complaint and the documents on which the claims made therein were based. <u>See Angelastro v. Prudential-Bache Sec., Inc.,</u> 764 F.2d 939, 944 (3d Cir. 1985); <u>see also In re Donald J. Trump Casino Sec. Litig.,</u> 7 F.3d 357, 368 n.9 (3d Cir. 1993). Thus, if we stopped our analysis here, we would have to reverse the district court's dismissal of this claim. There is an alternative basis, however, that warrants affirmance of the district court's decision.

The district court's opinion notes that, on July 29, 1994, <u>approximately two months prior</u> to the September 20 press release (where it was disclosed that the 53rd week of 1993 accounted for $23.2 million in sales), BCF had disclosed the information as to the $23.2 million in sales. (Dist. Ct. Op. at 16). Plaintiffs' Complaint tells us that this information, when released to the public, had "no appreciable effect on the market price of BCF common stock or on analysts' projections [as to the company's earnings for the year]." Complaint, ¶ 57. Plaintiffs' Complaint also informs us that BCF's stock was actively traded and carefully followed by market analysts and that the market for BCF stock was "efficient." Complaint, ¶ 23.

Because the market for BCF stock was "efficient" and because the July 29 disclosure had no effect on BCF's

24

price, it follows that the information disclosed on September 20 was immaterial as a matter of law. Ordinarily, the law defines "material" information as information that would be important to a reasonable investor in making his or her investment decision. See Westinghouse, 90 F.3d at 714. In the context of an "efficient" market, the concept of materiality translates into information that alters the price of the firm's stock. Cf. Shaw, 82 F.3d at 1218 (in cases involving the fraud on the market theory of liability, statements identified as actionably misleading are alleged to have caused injury, "not through the plaintiffs' direct reliance upon them, but by dint of the statements' inflating effect on the price of the security purchased") (emphasis added); Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993) (" `Soft', `puffing' statements . . . generally lack materiality because the market price of a share is not inflated by vague statements predicting growth") (emphasis added). This is so because efficient markets are those in which information important to reasonable investors (in effect, the market, see Shaw, 82 F.3d at 1218) is immediately incorporated into stock prices. See Langevoort, Market Efficiency, at 851; see also Roots Partnership v. Lands' End, Inc., 965 F.2d 1411, 1419 (7th Cir. 1992); Wielgos, 892 F.3d at 510 ("The Securities and Exchange Commission believes that markets correctly value the securities of well-followedfirms, so that new sales may rely on information that has been digested and expressed in the security's price."). Therefore, to the extent that information is not important to reasonable investors, it follows that its release will have a negligible effect on the stock price. In this case, plaintiffs have represented to us that the July 29 release of information had no effect on BCF's stock price. This is, in effect, a representation that the information was not material. See Fischel, Efficient Capital Markets, at 909-910; cf. Roots Partnership, 965 F.2d at 1419 (plaintiff asserting fraud on the market theory claimed to have been misled into purchasing company's securities on July 25, 1989 by earnings projection for the first quarter that was made on April 4, 1989; claim failed because company had disclosed its actual first quarter earnings on May 18 , 1989 and under plaintiffs' own efficient market theory this information

25

should have been incorporated into the price prior to plaintiff's purchase on July 25). If the July 29 information was immaterial, its nondisclosure in the 1993 Annual Report is not actionable.

(3) Reduced Supplier Discounts

Plaintiffs assert that "BCF purchased the bulk of its inventory of coats for 1994 in January and February 1994, yet defendants failed to disclose in its statements and reports from March 1, 1994 to September 23, 1994, that the discounts received were substantially less than in prior years." Complaint, ¶ 73(b). In order for an omission or misstatement to be actionable under Section 10(b) it is not enough that plaintiff identify the omission or misstatement. The omission or misstatement must also be material, i.e., something that would alter the total mix of relevant information for a reasonable investor making an investment decision. See Westinghouse, 90 F.3d at 714. Although questions of materiality have traditionally been viewed as particularly appropriate for the trier of fact, complaints alleging securities fraud often contain claims of omissions or misstatements that are obviously so unimportant that courts can rule them immaterial as a matter of law at the pleading stage. See, e.g., Shaw, 82 F.3d at 1217-18; Glassman, 90 F.3d at 635. Along these lines, the district court rejected plaintiffs' claim predicated on the undisclosed supplier discounts. The court made its ruling on the ground that the allegedly omitted information was too immaterial to form the basis for a legally viable claim.

There is a threshold procedural question that we must address before reaching the merits of the district court's decision on materiality. Plaintiffs claim that the district court committed reversible error in using information contained in BCF's 1994 Annual Report as a basis for its materiality analysis because the 1994 Annual Report was neither attached to, nor referred to, in the Complaint.

As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings. Angelastro, 764 F.2d at 944. However, an exception to the general rule is that a "document integral to or explicitly relied upon in the complaint" may be

26

considered "without converting the motion [to dismiss] into one for summary judgment." Shaw, 82 F.3d at 1220 (emphasis added); see also Trump, 7 F.3d at 368 n.9 ("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.") (quoting Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993)).

The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint -- lack of notice to the plaintiff-- is dissipated "[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993) (quoting Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991)); see also San Leandro, 75 F.3d at 808-09. What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent. See Shaw, 82 F.3d at 1220.

As best we can tell, plaintiffs are correct that the Complaint does not explicitly refer to or cite BCF's 1994 Annual Report. But the language in both Trump and Shaw makes clear that what is critical is whether the claims in the complaint are "based" on an extrinsic document and not merely whether the extrinsic document was explicitly cited. See Trump, 7 F.3d at 368 n.9; Shaw, 82 F.3d at 1220. Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them.

In this case, every time in the Complaint that plaintiffs refer to their claim that data as to lower discounts in January-February 1994 was required to be disclosed, but was not, plaintiffs support their claim by arguing that the data as to the January-February period was crucial to investors because this was the period during which BCF purchased the bulk of its 1994 inventory. Complaint,¶¶ 50, 54(b), 62, 73(b). This is an unambiguous reference to full-year cost data for 1994. The Complaint, however, does not

27

provide a citation for the source of full-year data for 1994. In the absence of such a citation, we think it was reasonable for the district court to have looked to the 1994 Annual Report that defendants provided.

Plaintiffs next argue that, even if consideration of the 1994 Annual Report were legitimate, the district court erred in dismissing their claim. The district court reasoned that to the extent the allegedly lower discounts in January-February 1994 were relevant to investors, they would be reflected in the 1994 "costs of goods sold." (Dist. Ct. Op. at 12). Plaintiffs assert that the court erred in looking at total costs. We disagree.

As previously noted, reasonable investors often rely on estimates of a firm's future earnings in deciding whether to invest in a firm's securities. See Glassman, 90 F.3d at 626. A reduction in discounts received on merchandise purchases would be material if it affected total costs and therefore earnings. In evaluating the materiality of the allegedly undisclosed lower discounts, therefore, the district court correctly looked to the effect of these allegedly lower discounts on total costs. The impact was negligible; total costs between 1993 and 1994 increased only 0.2%, and many factors other than merchandise discounts go into total costs. Where the data alleged to have been omitted would have had no more than a negligible impact on a reasonable investor's prediction of the firm's future earnings, the data can be ruled immaterial as a matter of law. Cf. Westinghouse, 90 F.3d at 714-15 (where plaintiffs alleged misstatements regarding loan loss reserves, but the claim was based on a failure to do a single write down that would have produced no more than a 0.54% change in the firm's net income, claim could be ruled immaterial as a matter of law); Glassman, 90 F.3d at 633 (where allegedly undisclosed information as to quarter-to-quarter changes in backlog was no more than a few percent, the claim of nondisclosure could be ruled immaterial as a matter of law). Hence, we affirm the district court's dismissal of this claim.

(4) & (5) Forward-Looking Statements

Plaintiffs allege that BCF misrepresented its future prospects to the public by making two forward-looking

statements that lacked a reasonable basis. The federal securities laws do not obligate companies to disclose their internal forecasts. See In re Lyondell Petrochemical Co. Sec. Litig., 984 F.2d 1050, 1052 (9th Cir. 1993); see also Glassman, 90 F.3d at 631; Shaw, 82 F.3d at 1209. However, if a company voluntarily chooses to disclose a forecast or projection, that disclosure is susceptible to attack on the ground that it was issued without a reasonable basis. See In re Craftmatic Sec. Litig., 890 F.2d 628, 645-46 (3d Cir. 1990); Herskovitz v. Nutri/System, Inc., 857 F.2d 179, 184 (3d Cir. 1988); Searls v. Glasser, 64 F.3d 1061, 1067 (7th Cir. 1995) ("Before management releases estimates to the public, it must ensure that the information is reasonably certain. If it discloses the information before it is convinced of its certainty, management faces the prospect of liability.") (citations omitted). The two forward-looking statements that plaintiffs attack are (1) a representation that BCF "believe[d] [it could] continue to grow net earnings at a faster rate than sales," and (2) a BCF officer's expression of "comfort" with analyst projections of $1.20 to $1.30 as a mid-range for earnings per share for fiscal year 1994. Complaint, ¶ 36. We examine the statements in turn, concluding that while the claims as to both were properly dismissed, plaintiffs should be given leave to amend their claims as to one.

Statement of Belief

BCF's Chief Accounting Officer's statement on November 1, 1993, that the company "believe[d] [it could] continue to grow net earnings at a faster rate than sales" can be broken down into two component parts. First, that as of November 1, 1993, the company's earnings had grown at a faster rate than sales, and second, that the company believed that this trend would continue. As to the first part of the statement, plaintiffs have not alleged that as of November 1, 1993, earnings had not been growing faster than sales. Instead, plaintiffs' claim focuses on the second portion of the statement -- the forward-looking portion.

The forward-looking portion of the statement here is a general, non-specific statement of optimism or hope that a trend will continue. Claims that these kinds of vague expressions of hope by corporate managers could dupe the

29

market have been almost uniformly rejected by the courts. See San Leandro, 75 F.3d at 811 (subdued, generally optimistic statements constituted nothing more than puffery and were not actionable); see also Shapiro v. UJB Fin. Corp., 964 F.2d 272, 283 n.12 (3d Cir. 1992); Glassman, 90 F.3d at 636; Searls, 64 F.3d at 1066; Hillson Partners Ltd. Partnership v. Adage, Inc., 42 F.3d 204, 212 (4th Cir. 1994) (deeming prediction of "significant sales gains . . . as the year progresses" too vague to be material). We agree, and thus hold that the statement at issue is too vague to be actionable. Moreover, to the extent plaintiffs are asserting that there was either a duty to correct or update the forward-looking portion of the statement,[13] those claims fail on account of the original statement's vagueness and resultant immateriality. See Gross v. Summa Four, Inc., 93 F.3d 987, 994-95 (1st Cir. 1996); Shaw, 82 F.3d at 1219 n.33 (cautiously optimistic statements, expressing at most a hope for a positive future, do not trigger a duty to update); In re Time Warner, Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993) (statements at issue lacked "definite positive projections" of the sort that might require later correction), cert. denied, 114 S. Ct. 1397 (1994).

Expression of Comfort

The second forward-looking statement at issue is BCF's Chief Accounting Officer's statement during a securities analysts' conference that he was "comfortable" with analysts' estimates of $1.20 to $1.30 as a mid-range for fiscal 1994 earnings per share. This statement was reported by Reuters on November 1, 1993. Plaintiffs assert (1) that this statement was actionable because it was not made with a reasonable basis, and (2) that BCF failed to fulfill its duty to correct this unreasonable forecast in the period following November 1, 1993. The district court, however, ruled that a corporate officer's expression of comfort with an analyst's projection of earnings cannot be the basis for a Section 10(b), Rule 10b-5 claim.

The Supreme Court has held that statements of opinion by top corporate officials may be actionable if they are

_____

13. As the district court noted, the Complaint is hardly a model of clarity.

30

made without a reasonable basis. See Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1098 (1991); see also Trump, 7 F.3d at 372 n.14 (applying the rationale of Virginia Bankshares, a Section 14(a) proxy solicitation case, to the Section 10(b) context); Glassman, 90 F.3d at 627. In particular, in Virginia Bankshares, the Court held actionable a board of directors' expression of opinion concerning a specific merger price. Id. at 2758-59 (board of directors expressed the opinion that merger price was "fair"); see also Glassman, 90 F.3d at 627 (holding actionable representations by the company and its underwriters that the prices for a public offering were fair and estimated based on the most current information available at the time of the offering). As explained by the Court in Virginia Bankshares, statements of opinion by corporate officials can be materially significant to investors because investors know that these top officials have knowledge and expertise far exceeding that of the ordinary investor. 501 U.S. at 1090-91; see also Glassman, 90 F.3d at 631. The rationale of Virginia Bankshares is applicable here, where BCF's Chief Accounting Officer expressed his agreement with certain projections by analysts.14

The district court rejected plaintiffs' claim on the ground that a company is not liable for an analyst's projection unless the company expressly "adopted or endorsed" the analyst's report. (Dist. Ct. Op. at 10, citing Weisbergh v. St. Jude Medical, Inc., 158 F.R.D. 638, 644 (D. Minn. 1994) ("This Court will not hold defendants responsible for the projections of market analysts absent an indication that defendants were responsible for the projections or in a position to influence or control them"), aff'd, 62 F.3d 1422 (8th Cir. 1985) and Raab v. General Physics Corp., 4 F.3d 286, 288 (4th Cir. 1993) ("The securities laws require General Physics to speak truthfully to investors; they do

_____

14. Certain vague and general statements of optimism have been held not actionable as a matter of law because they constitute no more than "puffery" and are understood by reasonable investors as such. See, e.g., San Leandro, 75 F.3d at 810. The puffery defense does not apply here since the expression of comfort was not vague; it was an agreement with a specific forecast range. Cf. Glassman, 90 F.3d at 636 (distinguishing vague statements of optimism from specific projections).

31

not require the company to police statements made by third parties for inaccuracies, even if the third party attributes the statement to General Physics)). Although we have no problem with the "adopt or endorse" test, we disagree with its application here.

To say that one is "comfortable" with an analyst's projection is to say that one adopts and endorses it as reasonable. When a high-ranking corporate officer explicitly expresses agreement with an outside forecast, that is close, if not the same, to the officer's making the forecast.15 We see no reason why adopting an analyst's forecast by reference should insulate an officer from liability where making the same forecast would not.

The cases the district court cites in support of its conclusion concern attacks on statements by analysts and claims that those statements should be attributed to the defendant company because the company allegedly provided the analysts with information. See Raab, 4 F.3d at 288; Weisbergh, 158 F.R.D. at 643. Plaintiffs' claim here, however, is not an indirect attempt to attribute an analyst's prediction to the company where the company itself has made no explicit statement (for example, because the company provided the analyst with all the relevant data or somehow controlled what the analyst was doing). Instead, plaintiffs directly attack BCF's CAO's own statement, as it was reported by Reuters. The attribution issue does not arise because at this stage we take as true the allegation that BCF's CAO did express comfort with the analyst projections at issue. Cf. Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 163 (2d Cir. 1980) ("attribution" question is answered by asking whether company officials have, expressly or impliedly, made a representation that the analyst projections are in accordance with their views); In re Adobe Systems, Inc. Sec. Litig., 767 F. Supp. 1023, 1027-28 (N.D. Cal. 1991) (denying motion to dismiss where

_____

15. This is not to discount the possibility of situations where the expression of agreement is so unenthusiastic that no reasonable investor would attach relevance to it. Here, however, as alleged by plaintiffs, the CAO's expression of comfort was enthusiastic enough that we cannot deem it immaterial as a matter of law.

32

corporate officer stated he "preferred" certain analyst estimates to others). Put differently, it is a statement by a BCF officer itself that is being attacked, not an analyst's statement.16

The next question for us is whether there are sufficient factual allegations supporting plaintiffs' theory for the claim to survive the Rule 9(b) hurdle. To adequately state a claim under the federal securities laws, it is not enough merely to identify a forward-looking statement and assert as a general matter that the statement was made without a reasonable basis. Instead, plaintiffs bear the burden of "plead[ing] factual allegations, not hypotheticals, sufficient to reasonably allow the inference" that the forecast was made with either (1) an inadequate consideration of the available data or (2) the use of unsound forecasting methodology. Glassman, 90 F.3d at 628-29 (rejecting plaintiffs' earnings projection claim on Rule 12(b)(6) grounds alone, albeit in the context of the plaintiffs having had the benefit of full discovery); cf. Virginia Bankshares, 501 U.S. at 1092-94 (describing the type of hard contemporaneous facts that could show an opinion as to the fairness of a suggested price to have been unreasonable when made); cf. also Shapiro, 964 F.2d at 284-85 (in attacking afirm's accounting practices with a claim that those practices resulted in the disclosure of misleading data, plaintiffs must (a) identify what those practices are and (b) specify how they were departed from)). In deciding a motion to dismiss, a court must take well-pleaded facts as true but need not credit a complaint's "bald assertions" or "legal

_____

16. The district court also noted that the earnings projections of $1.20-$1.30 per share for fiscal 1994 were not materially off the mark in that earnings turned out to be $1.12 per share. But this is an ex post justification. Securities laws approach matters from an ex ante perspective. See Pommer, 961 F.2d at 623. The fact that we see in hindsight that earnings per share did in fact turn out to be roughly within the range they were projected does not tell us conclusively that the forecasts were reasonable at the time they were made. Cf. Glassman, 90 F.3d at 627 ("[W]hile forecasts are not actionable merely because they do not come true, they may be actionable because they are not reasonably based on, or are inconsistent with, the facts at the time the forecast is made.").

33

conclusions." Glassman, 90 F.3d at 628. In this case, plaintiffs identified the offending forecasts and then alleged:

The foregoing statements were materially false and misleading when made since, at the time they were made, defendants knew, or recklessly disregarded, that their public statements and statements to analysts promoting BCF and its stock would artificially maintain and inflate the market price of BCF's common stock due to the false and misleading positive assurances contained therein. In particular, defendants had no reasonable basis to state publicly on November 1, 1993, and not to correct the November 1, 1993 statement in subsequent forward-looking projections, that Burlington Coat Factory would earn between $1.20 to $1.30 per share in fiscal year 1994 . . ..

Complaint, ¶ 37.

Plaintiffs' allegations do not suffice. In asserting that there was "no reasonable basis" for the November 1, 1993, earnings projection, plaintiffs simply mouth the required conclusion of law. See Glassman, 90 F.3d at 629-30. Plaintiffs' Complaint contains a number of vague factual assertions regarding the period prior to November 1, 1993, but plaintiffs have failed to link any of these allegations to their claim that the November 1 forecast was actionably unsound when made. The earnings projection claim therefore fails Rule 9(b)'s heightened pleading requirements.

The existence of these unlinked factual allegations, however, precludes us from holding that the Complaint is so bereft of facts, as the Glassman complaint was held to be, see id., that granting plaintiffs the opportunity to replead would be futile. On remand, therefore, plaintiffs should be given the opportunity to attempt to recast this claim in terms that satisfy Rule 9(b).

We turn next to the duties to correct and update an earnings projection.

Duties to Update and Correct

Plaintiffs also assert that BCF had a duty to correct the November 1, 1993, expression of comfort with the analysts' projections. In particular, plaintiffs point to the refusal of

34

BCF's CEO, Monroe Milstein, in an interview given to Reuters --reported on March 22, 1994 -- to comment on analysts' earnings projections for both the third quarter of 1994 and the full year. Plaintiffs assert that on March 22, 1994, and at other unspecified points in time after November 1, 1993, defendants had had a duty to correct the November 1 earnings projection.17 Although plaintiffs characterize their claim as a "duty to correct" claim, they appear to be asserting both a duty to correct and a duty to update.

The Seventh Circuit explained in Stransky v. Cummins Engine Co., Inc., 51 F.3d 1329 (7th Cir. 1995), that the duty to correct is analytically different from the duty to update, although litigants, as appears to be the case here, often fail to distinguish between the two. Id. at 1331. As the Stransky court pointed out, a Section 10(b) plaintiff ordinarily is required to identify a specific statement made by the company and then explain either (1) how the statement was materially misleading or (2) how it omitted a fact that made the statement materially misleading. Id. The duties to update and correct are two other avenues of finding a duty to disclose that "have been kicked around by courts, litigants and academics alike." Id.; cf. William B. Gwyn, Jr. and W. Christopher Matton, The Duty to Update the Forecasts, Predictions, and Projections of Public Companies, 24 Sec. Reg. L. J. 366 (1997); Robert H. Rosenblum, An Issuer's Duty Under Rule 10b-5 to Correct and Update Materially Misleading Statements, 40 Cath. U. L. Rev. 289 (1991).

(a) Duty to Correct

The Stransky court articulated the duty to correct as applying:

_____

17. Plaintiffs suggest that by March 22, 1994, analysts' projections for BCF's 1994 earnings per share had risen above the $1.20 to $1.30 mid-range with which BCF's CAO had expressed comfort some months prior. Complaint ¶ 49. The fact that analysts' projections independently increased above the predicted range, however, has no relevance to the claim at hand because plaintiffs have not identified any free-standing duty on the part of a public company to "police" the forecasts being made by analysts. See Raab, 4 F.3d at 288 (no duty to police statements by third parties).

35

when a company makes a <u>historical statement</u> that, at the time made, the company believed to be true, but as revealed by <u>subsequently discovered</u> information actually was not. The company then must correct the prior statement within a reasonable time.

51 F.3d at 1331-32 (emphasis added); <u>see also Backman v. Polaroid Corp.</u>, 910 F.2d 10, 16-17 (1st Cir. 1990) (<u>in banc</u>) ("Obviously, if a disclosure is in fact <u>misleading when made</u>, and the speaker thereafter learns of this, there is a duty to correct it.") (emphasis added). We have no quarrel with the <u>Stransky</u> articulation, except to note that we think the duty to correct can also apply to a certain narrow set of forward-looking statements. We will attempt to illustrate the kinds of circumstances we have in mind with an example.

Imagine the following situation. A public company in Manhattan makes a forecast that appears to it to be reasonable at the time made. Subsequently, the company discovers that it misread a vital piece of data that went into its forecast. Perhaps a fax sent by the company's factory manager in some remote location was blurry and was reasonably misread by management in Manhattan as representing sales for the past quarter as 100,000 units as opposed 10,000 units. Manhattan management then makes an erroneous forecast based on the information it has at the time. A few weeks later, management receives the correct sales figures by mail. So long as the correction in the sales figures was material to the forecast that was disclosed earlier, we think there would likely be a duty on the part of the company to disclose either the corrected figures or a corrected forecast. In other words, there is an implicit representation in any forecast (or statement of historical fact) that <u>errors</u> of the type we have identified will be corrected. This duty derives from the implicit factual representation that a public company makes whenever it makes a forecast, <u>i.e.</u>, that the forecast was reasonable at the time made. What is crucial to recognize is that the error, albeit an honest one, was one that had to do with information <u>available at the time the forecast was made</u> and that the error in the information was subsequently discovered. <u>Cf. Rudolph v. Arthur Andersen & Co.</u>, 800 F.2d

36

1040, 1043-44 (11th Cir. 1986) (distinguishing between information that is subsequently discovered that shows a report to have been erroneous at the time made (where a duty to correct might exist) and ordinary subsequently developing information that might reflect on the report, but does not show it to have been inaccurate at the time made (where there is no duty to correct)).

Plaintiffs phrase their claim as based on a "duty to correct." Earlier in the opinion, we explained that plaintiffs' attack on the reasonableness of the earnings forecast failed because plaintiffs had not met their duty of pleading an adequate set of specific factual allegations from which one could reasonably infer that the November 1, 1993, forecast was made unreasonably. Similarly, as to the "duty to correct" claim, plaintiffs have failed to allege how and what the specific error or set of errors might have been that went into the November 1, 1993, forecast. Nor have the plaintiffs identified the specific times at which those errors were discovered, so as to allow correction and trigger defendants' alleged duty. Therefore, the "duty to correct" claim (to the extent one is being made) fails Rule 9(b)'s pleading standards. In any event, we think plaintiffs' claim is better characterized as a "duty to update" claim.

### (b) Duty to Update

The duty to update, in contrast to the duty to correct, concerns statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events. See Greenfield v. Heublein, Inc., 742 F.2d 751, 758 (3d Cir. 1984); Backman, 910 F.2d at 17. In Greenfield, we explained that updating might be required if a prior disclosure "[had] become materially misleading in light of subsequent events." 742 F.2d at 758; cf. Time Warner, 9 F.3d at 267. However, although we have generally recognized that a duty to update might exist under certain circumstances, we have not clarified when such circumstances might exist. Cf. Phillips, 881 F.2d at 1245; Greenfield, 742 F.2d at 758-60; Backman, 910 F.2d at 17 (the duty arises only under "special circumstances"). Specifically, we have not addressed the question whether a duty to update might exist for ordinary, run-of-the-mill forecasts, such as the earnings projection in this case.

37

At issue here is the statement of BCF's CAO on November 1, 1993, that he was comfortable with analyst projections of $1.20 to $1.30 as a mid-range for earnings per share in fiscal 1994. Plaintiffs' argument appears to be that, as BCF obtained information in the period subsequent to November 1, 1993, that would have produced a material change in the earnings projection for fiscal 1994, there was an ongoing duty to disclose this information. In essence then, the claim is that the disclosure of a single specific forecast produced a continuous duty to update the public with either forecasts or hard information that would in any way change a reasonable investor's perception of the originally forecasted range. We decline to hold that the disclosure of a single, ordinary earnings forecast can produce such an expansive set of disclosure obligations.

For a plaintiff to allege that a duty to update a forward-looking statement arose on account of an earlier-made projection, the argument has to be that the projection contained an implicit factual representation that remained "alive" in the minds of investors as a continuing representation. Cf. Stransky, 51 F.3d at 1333 (in determining the scope of liability that a forward-looking statement can produce, one looks to the implicit factual representations therein); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1277 (D.C. Cir. 1994). Determining whether such a representation is implicit in an ordinary forecast is a function of what a reasonable investor expects as a result of the background regulatory structure. In particular, we note three features of the existing federal securities disclosure apparatus:

1. Except for specific periodic reporting requirements (primarily the requirements to file quarterly and annual reports), there is no general duty on the part of a company to provide the public with all material information. See Time Warner, 9 F.3d at 267 ("a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact"). Thus, possession of material nonpublic information alone does not create a duty to disclose it. See Shaw, 82 F.3d at 1202; Roeder v. Alpha Indus., Inc., 814 F.2d 22, 26 (1st Cir. 1987) (citing Chiarella v. United States, 445 U.S. 222, 235 (1980)).

38

2. Equally well settled is the principle that an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in progress. See Shaw, 82 F.3d at 1202; Raab v. General Physics Corp., 4 F.3d 286, 289 (4th Cir. 1993); In re Convergent Technologies Sec. Litig., 948 F.2d 507, 513-14 (9th Cir. 1991) (rejecting plaintiffs' contention that accurate reporting of past results "misled investors by implying that [the company] expected the upward first quarter trend to continue throughout the year"); Zucker v. Quasha, 891 F. Supp. 1010, 1015 (D.N.J.), aff'd, 82 F.3d 408 (3d Cir. 1996).

3. Finally, the existing regulatory structure is aimed at encouraging companies to make and disclose internal forecasts by protecting them from liability for disclosing internal forecasts that, although reasonable when made, turn out to be wrong in hindsight. See Stransky, 51 F.3d at 1333. Companies are not obligated either to produce or disclose internal forecasts, and if they do, they are protected from liability, except to the extent that the forecasts were unreasonable when made. See Glassman, 90 F.3d at 631. The regulatory structure seeks to encourage companies to disclose forecasts by providing companies with some protection from liability. However, where it comes to affirmative disclosure requirements, the current regulatory scheme focuses on backward-looking "hard" information, not forecasts. See id. (citing Frank H. Easterbrook and Daniel R. Fischel, The Economic Structure of Corporate Law, 305-06 (1991)). Increasing the obligations associated with disclosing reasonably made internal forecasts is likely to deter companies from providing this information -- a result contrary to the SEC's goal of encouraging the voluntary disclosure of company forecasts. Cf. Stransky, 51 F.3d at 1333; Raab, 4 F.3d at 290.

Based on features one and two, we do not think it can be said that an ordinary earnings projection contains an implicit representation on the part of the company that it will update the investing public with all material information that relates to that forecast. Under existing law,

39

the market knows that companies have neither a specific obligation to disclose internal forecasts nor a general obligation to disclose all material information. Shaw, 82 F.3d at 1202 & 1209. We conclude that ordinary, run-of-the-mill forecasts contain no more than the implicit representation that the forecasts were made reasonably and in good faith. Cf. Stransky, 51 F.3d at 1333; Kowal, 16 F.3d at 1277. Just as the accurate disclosure of a line of past successes has been ruled not to contain the implication that the current period is going just as well, see Gross, 93 F.3d at 994, disclosure of a specific earnings forecast does not contain the implication that the forecast will continue to hold good even as circumstances change.

Finally, the federal securities laws, as they stand today, aim at encouraging companies to disclose their forecasts. A judicially created rule that triggers a duty of continuous disclosure of all material information every time a single specific earnings forecast is disclosed would likely result in a drastic reduction in the number of such projections made by companies. It is these specific earnings projections that are the most useful to investors in deciding whether to invest in a firm's securities. Cf. Marx v. Computer Sciences Corp., 507 F.2d 485, 489 (noting the importance of earnings projections to investors who are assessing the value of a stock); John S. Poole, Improving the Reliability of Management Forecasts, 14 J. Corp. L. 547, 548 & 558 (1989) (noting both the importance to investors of projections of future financial performance and the problem of using these forecasts where companies make them vague). The only types of projections that would be exempt from the duty of continuous disclosure advocated by plaintiffs, and hence the only types of projections that would likely be disclosed under the rule proposed by plaintiffs, would be vague expressions of hope and optimism that are of little use to investors. See, e.g., Lewis v. Chrysler Corp., 949 F.2d 644, 652-53 (3d Cir. 1991); Raab, 4 F.3d at 289. Therefore, apart from the fact that plaintiffs' disclosure theory has no support in the existing regulatory structure, adopting it would severely undermine the goal of encouraging the maximal disclosure of information useful to investors. Cf. Hillson, 42 F.3d at 219 (increasing the level of liability for projections would

40

produce a result contrary to the goals of full disclosure that underlie the federal securities laws). In sum, under the existing disclosure apparatus, the voluntary disclosure of an ordinary earnings forecast does not trigger any duty to update.18

We pause to reemphasize that the circumstances in Greenfield and Phillips, two cases in which we recognized that a duty to update might exist, were vastly different from the situation at hand: the disclosure of an ordinary earnings projection. In both Greenfield and Phillips, the initial disclosures that were argued to have triggered the duty to update involved information about events that could fundamentally change the natures of the companies involved. Specifically, both cases involved takeover attempts, and the plaintiffs were claiming that they should have been updated with information as to these attempts. See Greenfield, 742 F.2d at 758-59; Phillips, 881 F.2d at 1239 & 1245.19 Where the initial disclosure relates to the announcement of a fundamental change in the course the company is likely to take, there may be room to read in an implicit representation by the company that it will update

_____

18. We do not need to decide now whether our analysis would differ if the context were one in which the company had a pattern or practice of disclosing periodic updates any time it made a forecast. Plaintiffs have not alleged that BCF had a practice of providing periodic updates on earnings projections; nor have they alleged that such was the industry or market practice.

19. The "duty to update" claims were eventually rejected in both cases. In Greenfield, the court held that there had been no initial statement as to the existence of a takeover attempt or merger negotiations that could have triggered a subsequent duty. 742 F.2d at 759. In Phillips, although there was an initial triggering statement, plaintiffs did not produce evidence of any subsequently arising change of intent that might have been required to be disclosed. 881 F.2d at 1246.

In addition, it is worth noting that the source of the "duty to update" requirement in Phillips was a specific regulation, 17 C.F.R. § 240.13d-1, that required that "where `any material change occur[ed] in the facts set forth' in a Schedule 13D," a company was required to " `promptly' file `an amendment disclosing such change' with the Securities and Exchange Commission, the issuer of the security, and with any exchange on which the security is traded." 881 F.2d at 1245.

41

the public with news of any radical change in the company's plans -- e.g., news that the merger is no longer likely to take place.20 Cf. Phillips, 881 F.2d at 1246 (noting that "[f]ew markets shift as quickly and dramatically as the securities market, especially where a publicly traded company has been `put in play' by a hostile suitor. The . . . statements were broad and unequivocal, providing no contingency for changing circumstances . . . [and could] fairly be read as a statement by the Partnership that, no matter what happened, it would not change its intentions."). But finding a duty to update a disclosure of a takeover threat is a far cry from finding a duty to update a simple earnings forecast which, if anything, contains a clear implication that circumstances underlying it are likely to change.

### B. Leave to Amend

Plaintiffs' final contention is that the district court erred in denying them leave to replead. The district court granted defendants' motion to dismiss on both Rule 12(b)(6) and Rule 9(b) grounds. Plaintiffs had requested that, in the event their Complaint was dismissed, they be given leave to replead. The court, however, dismissed the action in its entirety.

As a general matter, we review the district court's denial of leave to amend for abuse of discretion. See Lorenz v. CSX Corp., 1 F.3d 1406, 1413 (3d Cir. 1993); De Jesus v. Sears Roebuck & Co., 87 F.3d 65, 71 (2d Cir. 1996). Federal Rule of Civil Procedure 15(a) provides that "leave[to amend] shall be freely given when justice so requires." Glassman, 90 F.3d at 622. The Supreme Court has cautioned that although "the grant or denial of an opportunity to amend is

_____

20. We emphasize that we are not saying that once a fundamental change is announced the company faces a duty continuously to update the public with all material information relating to that change. Instead, we think that the duty to update, to the extent it might exist, would be a narrow one to update the public as to extreme changes in the company's originally expressed expectation of an event such as a takeover, merger, or liquidation. But cf. Eisenstadt v. Centel Corp., __ F.3d __, __ 1997 WL 242251, *8 (7th Cir.) (suggesting that even such a narrow duty might not exist).

42

within the discretion of the District Court, . . . outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of that discretion; it is merely an abuse of that discretion and inconsistent with the spirit of the Federal Rules." Forman v. Davis, 371 U.S. 178, 182 (1962). Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility. Id.; Lorenz, 1 F.3d at 1414; Glassman, 90 F.3d at 622.

The district court made no finding that plaintiffs acted in bad faith or in an effort to prolong litigation; nor did the court find that defendants would have been unduly prejudiced by the amendment. Cf. Glassman, 90 F.3d at 622. We are left to conclude, therefore, that the denial of leave to amend was based on the court's belief that amendment would be futile. In fact, in discussing this issue, defendants' brief starts out by urging us to affirm the district court's denial of leave to amend because"any attempted additional amendment of that pleading would be futile." (Appellees' Br. at 43) (citation and internal quotation omitted). "Futility" means that the complaint, as amended, would fail to state a claim upon which relief could be granted. Glassman, 90 F.3d at 623 (citing 3 Moore's Federal Practice ¶ 15.08[4], at 15-80 (2d ed. 1993)). In assessing "futility," the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6). Id. (citing 3 Moore's at ¶ 15.08[4], at 15-81). The district court here rejected plaintiffs' claims on both Rule 12(b)(6) and Rule 9(b) grounds.

Ordinarily where a complaint is dismissed on Rule 9(b) "failure to plead with particularity" grounds alone, leave to amend is granted. See Shapiro, 964 F.2d at 278; Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1987); Yoder v. Orthomolecular Nutrition Inst., Inc., 751 F.2d 555, 561-62 & n.6 (2d Cir. 1985) (citation omitted). However, the Complaint in this case was plaintiffs' second. Further, plaintiffs not only had approximately four months between the initially filed complaints and the revised, consolidated complaint that is at issue here, but the Complaint appears to have represented the efforts of not one, but four different, law firms. Hence, it is conceivable that the district

43

court could have found undue delay or prejudice to the defendants. But the court made no such determination, and we cannot make that determination on the record before us. Therefore, to the extent we can affirm the district court's determinations on Rule 12(b)(b) grounds alone (i.e., for futility, see Glassman, 90 F.3d at 623), we shall affirm the denial of leave to replead. These claims would not survive a Rule 12(b)(6) motion even if pled with more particularity. See Luce, 802 F.2d at 56-57. But, where the district court's dismissals can be justified only on Rule 9(b) particularity grounds we reverse the denial of leave to replead. See id. On the latter set of claims, we borrow the words of the Second Circuit that "because we are hesitant to preclude the prosecution of a possibly meritorious claim because of defects in the pleadings, we believe that the plaintiffs should be afforded an additional, albeitfinal opportunity, to conform the pleadings to Rule 9(b)." Ross v. A.H. Robins Co., 607 F.2d 545, 547 (2d Cir. 1979).

IV.

We conclude that the Complaint survives scrutiny under Rule 12(b)(6) to the extent that it alleges: (1) that the defendants overstated BCF's quarterly income by 2-3 cents per share in each quarter of fiscal year 1994; (2) that management's expression of "comfort" with analysts' projections of a mid-range of earnings of $1.20 to $1.30 per share for fiscal 1994 was unreasonable when made. Neither of these claims, however, survives Rule 9(b)'s particularity requirements.21 Ordinarily, complaints dismissed under Rule 9(b) are dismissed with leave to amend. See Luce, 802 F.2d at 56. As best we can tell from the district court's opinion, the reason for the denial of leave to amend here appears to be that the court thought plaintiffs had failed the threshold burden of stating claims that could survive a Rule 12(b)(6) motion. However, since we hold that the above-mentioned claims did pass Rule 12(b)(6) we reverse

_____

21. The duty to update portion of the attack on the earnings projection fails altogether as we decline to recognize the existence of such a claim for an ordinary earnings forecast.

44

the court's denial of leave to amend on these claims.22 In all
other respects, we affirm the district court.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

_____

22. On remand, after plaintiffs tender their proposed amendments, the
district court shall consider whether the amendments would be futile.

44