## ARGENT CLASSIC CONVERTIBLE ARBITRAGE FUND L.P. and Argent Classic Convertible Arbitrage Fund (Bermuda)

v.

## RITE AID CORP., et al.

### No. Civ.A.00–1114.

United States District Court, E.D. Pennsylvania.

April 27, 2004.

As Amended May 24, 2004.

Ira M. Press, Mark A. Strauss, Kirby McInerney & Squire LLP, Roger W. Kirby, William C. Fredericks, Milberg, Weiss, Bershad, Hynes & Lerach LLP, New York City, Justin K. Miller, Peter F. Marvin, Marvin Larsson Hankin & Scheuritzel, Sherrie R. Savett, Berger & Montague, PC, Philadelphia, PA, for Plaintiffs.

Douglas L. Flitter, Ballard Spahr Andrews & Ingersoll, LLP, William A. Slaughter, Ballard Spahr Andrews and Ingersoll, James J. Rodgers, Dilworth Paxson L.L.P.; David J. Creagan, Harkins

Cunningham, Eleanor Illoway, Harkins Cunningham LLP, David M. Howard, Dechert LLP, John E. Caruso, Montgomery McCracken Walker & Rhoads, LLP, Philadelphia, PA, for Defendants.

## MEMORANDUM

DALZELL, District Judge.

Two arbitrageurs, Argent Classic Convertible Arbitrage Fund L.P. ("Argent") and Argent Classic Convertible Arbitrage Fund (Bermuda) L.P. ("Argent Bermuda", and with Argent, "the Argent Companies") invested heavily in securities of Rite Aid Corporation ("Rite Aid") throughout the late 1990s. When details of an alleged $1.6 billion accounting fraud at Rite Aid surfaced, the Argent Companies filed this action against Rite Aid, several of its former executives and its former auditor. We now address the defendants' motions to dismiss.[1]

*Factual Background*

Rite Aid operates one of the largest retail drugstore chains in the United States. Second Am. Compl. ("Compl.") ¶ 30. Beginning sometime before 1997, Rite Aid's top executive officers included Chairman of the Board of Directors and Chief Executive Officer Martin L. Grass; President and Chief Operating Officer Timothy J. Noonan; and Executive Vice President and Chief Financial Officer Frank M. Bergonzi. *Id.* ¶¶ 31–33. KPMG served as Rite Aid's auditor and principal accounting firm. *Id.* ¶ 39.

The Argent Companies, which are two associated investment funds, acquired positions in two types of Rite Aid securities between September 4, 1997 and October 25, 1999. *Id.* ¶¶ 1–2; *see also id.* Ex. A (listing transactions). First, they sold short shares of Rite Aid common stock.[2] The Argent Companies also invested in Rite Aid 5–1/4% convertible bonds due on September 15, 2002.[3] These investments

---

1. The Court may grant a motion to dismiss under Rule 12(b)(6) "only if, accepting all well pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In other words, we will not grant such a motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir. 2000) (permitting dismissal "only if it appears that the [plaintiffs] could prove no set of facts that would entitle [them] to relief"). "The complaint will be deemed to have alleged sufficient facts if it adequately put the defendants on notice of the essential elements of the plaintiffs' cause of action." *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). We shall

review factual background for plaintiffs' claims with these principles in mind.

2. A short sale occurs when an investor sells stock that she does not own, but which she is committed to repurchasing. *See* Campbell R. Harvey, *Hypertextual Finance Glossary, at* http:// www.duke.edu/čharvey/Classes/wpg/ glossary.htm (2003). If the stock price declines after the sale, then the investor will be able to "cover" her short position by buying shares at a lower price than the price at which she sold them, thereby earning a profit. If the share price rises between the sale and the covering purchase, then the investor will lose money when she repurchases the shares.

3. A convertible bond is a debt obligation of a corporation that can be exchanged for a set number of common shares of the issuing corporation at a prestated conversion price. *See* Campbell R. Harvey, *Hypertextual Finance Glossary, at* http://www.duke.edu/čharvey/Classes/wpg/glossary.htm (2003).

The price of a convertible bond depends on the value of the bond itself as an investment

were complementary parts of the Argent Companies' "convertible arbitrage" strategy, which sought to hedge the risk that declining common stock price would depress conversion value with the profits that short sales of common stock would generate if stock prices fell. Although convertible arbitrage could insulate the Argent Companies from declining conversion value, it could not protect them from plummeting straight-bond value. *Id.* ¶¶ 6, 45–49. Because their arbitrage strategy did not protect them from exposure to risk of Rite Aid defaulting on the convertible bonds, the Argent Companies carefully reviewed the statements that Rite Aid made in its financial disclosures and relied on those statements to assess Rite Aid's creditworthiness before purchasing securities. *See, e.g., id.* ¶¶ 4, 5, 44, 50.

As it turned out, however, their reliance was misplaced. Beginning at least in 1997, Rite Aid systematically used improper accounting practices that inflated its earnings and created a false impression of its creditworthiness. *See, e.g., id.* ¶¶ 8, 11, 61, 189–201. As Rite Aid's top executives,

Grass, Noonan, and Bergonzi were aware of these practices (or at least recklessly allowed them to continue), *id.* ¶¶ 35–38, and KPMG allegedly assisted this deception by knowingly (or recklessly) issuing unqualified opinions that Rite Aid's financial statements fairly presented its financial position and results of operations in accordance with generally accepted accounting principles ("GAAP"), *id.* ¶¶ 10, 20, 39–41, 202–244.

Still, these accounting improprieties would not begin to emerge until, at the earliest, March 12, 1999, when Rite Aid revealed that its earnings would be significantly lower than expected. *See id.* ¶¶ 12, 106–120. Between September 4, 1997 and March 11, 1999, the Argent Companies conducted scores of transactions in Rite Aid common stock and convertible bonds, and they realized an aggregate gain of almost $1.6 million on these trades. After taking their profits, the Argent Companies—with two immaterial exceptions [4]—owned no Rite Aid common stock or convertible bonds between March 11, 1999 and September 21, 1999.

vehicle (the "straight-bond value") and the value of the bond's conversion feature (the "conversion value"). As a corporation's common stock price rises, the convertible bond's conversion value will also increase to reflect the additional profit that a convertible-bond investor could capture by converting the bond into common stock. Likewise, a falling common stock price will depress conversion value (and, thus, the price of the convertible bond) because an investor could not hope to gain as much by converting the bond into common stock. When the stock price falls below the price for which an investor could exchange bonds for stock, the conversion value will equal zero because the investor could purchase stock on the market more cheaply than she could obtain stock by exchanging her bonds.

Though often correlated with common stock price, straight-bond value does not depend as directly on common stock price as conversion value. Straight-bond value re-

flects the investment community's appraisal of the corporation's ability to repay the principal and interest due on the bond. Both straight-bond value and common stock price will usually decline when investors perceive a serious risk of default, but the common stock decline does not *cause* the decline in straight-bond value in the same way that it causes a decline in conversion value.

4. The first exception is that Argent bought and sold convertible bonds and common stock for a net profit of $29,671.20 on March 24, 1999. Because Argent suffered no loss from these "in-and-out" trades, we need not dwell on them.

The .second exception is that Argent was short 1000 shares of Rite Aid stock at all times—except for a few hours on March 24—between March 11, 1999 and September 21, 1999. We treat this position as immaterial because Argent ultimately turned a profit with its covering purchase.

While the Argent Companies were either making money on Rite Aid securities or holding no significant position in them, Rite Aid pursued a strategy that ultimately accelerated the disclosure of its murky accounting practices. On November 17, 1998, Rite Aid issued a press release announcing that it had agreed to purchase PCS, a pharmacy benefits manager that Eli Lilly and Co. owned, for $1.5 billion, an acquisition Rite Aid hoped to finance with stock. *Id.* ¶ 89. As one of the preliminary steps in the PCS acquisition, Rite Aid filed a Form S–4 with the SEC. *Id.* ¶ 94. On December 21, 1998, the SEC asked Rite Aid for explanations of certain aspects of its 1998 financial statements. *See id.* ¶ 97. Rite Aid responded to the SEC's request on January 12, 1999, but the response continued to obscure the full extent of Rite Aid's financial problems. *Id.* ¶ 103.

Rite Aid completed the PCS acquisition on January 22, 1999, paying the $1.5 billion purchase price with cash borrowed from J.P. Morgan. *Id.* ¶¶ 89, 104. To retire this debt, Rite Aid planned to issue up to $3 billion in new equity securities, but Grass, Noonan, and Bergonzi allegedly knew that investors would not participate in such an offering unless Rite Aid appeared to be in a solid financial position. *Id.* ¶¶ 104–105. To make the offering more attractive, they allegedly used many accounting gimmicks to inflate Rite Aid's profits. When even these gambits failed to generate sufficient earnings, Rite Aid on March 12, 1999 predicted that its earnings for the fourth quarter of fiscal year 1999 would be between $0.30 to $0.32 per share, significantly lower than the $0.52 per share that analysts had expected. *Id.* ¶¶ 12,

106–120. On March 29, 1999, Rite Aid officially announced its fourth quarter earnings as $0.28 per share. *Id.* ¶ 121.

In February, 1999, as the SEC was scrutinizing Rite Aid's statements in the context of an imminent offering of up to $3 billion in securities, and with a fiscal 1999 audit looming, Michael Cover, the KPMG partner who had supervised the 1997 and 1998 audits, took a leave of absence from the firm. KPMG assigned Michael Hussey to oversee the 1999 audit. *Id.* ¶¶ 61(b)(i), 123. Hussey quickly discovered some of Rite Aid's accounting deficiencies, and he insisted on restating its past earnings. *Id.* ¶¶ 124. On June 1, 1999, Rite Aid filed its Form 10–K for fiscal year 1999 with the SEC, and this document recognized that Rite Aid had overstated its earnings in 1997, 1998, and the interim quarters of 1999 by $23.4 million. *Id.* ¶¶ 13, 54, 125–129, 133.[5] Grass removed Bergonzi as Chief Financial Office on June 14, 1999, but Bergonzi continued to work at Rite Aid. *Id.* ¶ 33. Joseph Speaker became Rite Aid's new CFO. *Id.* ¶ 142.

On June 24, 1999, KPMG drafted a letter to Rite Aid's Audit Committee that expressed concern about Rite Aid's management and internal accounting controls. KPMG delivered the June 24 letter to the Audit Committee at its June 30, 1999 meeting. *Id.* ¶¶ 19, 61(b)(i), 139, 178–180. KPMG claims that it told the Audit Committee at that meeting that it would not be in a position to issue quarterly review reports until Rite Aid addressed its concerns. KPMG also said that it was no longer willing to rely on Bergonzi's repre-

---

**5.** KPMG certified that Rite Aid's 1999 Form 10–K, including the restatements of previously reported earnings, conformed with GAAP. Compl. ¶ 129. Argent alleges that KPMG knew that the June 1, 1999 disclosure had not revealed the full extent of the fraud, but KPMG opted to "play for time," allowing Rite Aid to continue to conceal the accounting improprieties while hoping that Rite Aid's financial situation would improve. *Id.* ¶¶ 136–138.

sentations.[6] Rite Aid denies that KPMG ever made these statements. *Id.* ¶ 40.

During the week of July 9, 1999, Hussey and another KPMG partner met with Speaker and Rite Aid's new Controller to discuss the concerns aired before the Audit Committee. At this meeting, Hussey gave Speaker a list of thirty "Rite Aid Corp. Accounting Considerations"—that is, changes that KPMG would require Rite Aid to make to its accounting practices before it would certify Rite Aid's fiscal 2000 financial statements. *Id.* ¶¶ 21, 61(b)(ii), 142.

On September 22, 1999, Rite Aid cancelled a meeting with analysts that it had already postponed twice, and this decision created grave concern among analysts and credit rating agencies. *See id.* ¶¶ 15, 153–156. The Argent Companies, however, began that day to purchase Rite Aid convertible bonds again, and they accumulated a $58 million position in the bonds by October 25, 1999. *Id.* Ex. A.

After discovering more irregularities, Speaker brought his concerns about Rite Aid's accounting practices to the Audit Committee on October 7, 1999. *Id.* ¶¶ 163–165. The Committee suggested that Speaker hire an outside accountant to address his concerns, and Speaker selected Ten Eyck Associates, Inc. Four days later, Rite Aid announced that it planned to restate its earnings for the second time in six months. Within a week, Rite Aid's Board of Directors had pressured Grass to resign from his positions as Chairman and Chief Executive Officer. *Id.* ¶¶ 16, 31, 165–171.

On November 2, 1999, Rite Aid filed its Form 10–Q for the second quarter of fiscal year 2000. The Form revealed that Rite Aid had restated its previously reported 1999 and 2000 earnings, reducing them by about $500 million. *Id.* ¶¶ 17, 54, 172–174. Finally, on November 10, 1999, Rite Aid warned analysts and investors not to rely on its earlier profit forecasts. *Id.* ¶¶ 18, 175–176. KPMG resigned as Rite Aid's auditor soon thereafter. *Id.* ¶ 177.

Throughout December of 1999, the Argent Companies liquidated their positions in Rite Aid securities. They took a loss of more than $4.3 million on their convertible bonds, and they earned less than $20,000 in profit from short sales of common stock. *Id.* Ex. A. By the end of 1999, Argent Bermuda owned convertible bonds with a face value of $24.5 million and was short 11,100 shares of common stock. Argent held convertible bonds with $17 million face value and had sold short 12,600 shares of common stock. *Id.*

To uncover the full scope of the fraud, Rite Aid retained Deloitte to audit its 1997, 1998, and 1999 financial statements. *Id.* ¶ 182. Two hundred accountants are said to have worked on Deloitte's $50 million investigation, and they uncovered dozens of previously undetected accounting improprieties. *See id.* ¶ 61(a), at 26–36. On July 11, 2000, Rite Aid filed a Form 10–K for fiscal year 2000. The Form restated Rite Aid's earnings for 1997, 1998, and 1999 and revealed that Rite Aid's original financial statements had overstated earnings by $1.6 billion. *Id.* ¶¶ 9, 22–23, 54, 186. Grass and Bergonzi ultimately each pled guilty to charges of criminal conspiracy to defraud. *Id.* ¶ 58.

In all, the Argent Companies claim to have lost more than $10 million as a result of the alleged $1.6 billion accounting fraud, and they hope to recover from Rite Aid,

---

6. The complaint does not explain why KPMG would have felt the need to explain that it would not rely on Bergonzi's representations after Grass had removed Bergonzi as Chief Financial Officer.

Grass, Noonan, Bergonzi,[7] and KPMG. Plaintiffs' five-count complaint—which by virtue of plaintiffs' opt-outs survives the now-final class action settlements we approved in 2001 and 2003 [8]—alleges that the defendants violated Sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 (the "Act") and that they committed common law fraud. The defendants have moved to dismiss the complaint for failure to state claims upon which relief may be granted.[9]

*Analysis*

A. *Section 10(b)*

█ Counts 1 and 2 of the Complaint allege that the Rite Aid Defendants and KPMG, respectively, violated Section 10(b) of the Act, which makes it illegal "[t]o use or employ, in connection with the purchase. or sale of any security registered on a national securities exchange ... any manipulative or deceptive device or contrivance...." 15 U.S.C. § 78j(b) (2003). To clarify this broad language, Rule 10b–5(b) specifies that it is illegal "[t]o make any untrue statement of a material fact ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b) (2004). Our Court of Appeals has further explained that, to state a valid claim for a violation of Section 10(b) and Rule 10b–5, a plaintiff must show that "the defendant (1) made a misstatement or an omission of a

---

**7.** We refer to Grass, Noonan, and Bergonzi as the "Individual Defendants" and to the Individual Defendants and Rite Aid, collectively, as the "Rite Aid Defendants."

**8.** *See In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706 (E.D.Pa.2001) (approving partial class action and derivative settlements) and *In re Rite Aid Corp. Sec. Litig.*, 269 F.Supp.2d 603 (E.D.Pa.2003) (approving settlements with Grass, Noonan and KPMG, as well as significant modification to the 2001 settlement). Together, the class action aspect of these global settlements exceeded $334 million.

We consolidated the Argent Companies' action with the other actions on May 24, 2000, and thus no further action took place in this particular matter until after the 2003 approval when, on July 23, 2003, we unconsolidated this case from MDL 1360 as a result of plaintiffs' opt-out from the global settlements.

**9.** In addition to the general standards of Fed. R.Civ.P. 12(b)(6), *see supra* note 1, several of the plaintiffs' claims must also satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") § 101(b), Pub.L. No. 104–67, 109 Stat. 737, 743 (codified at 15 U.S.C. § 78u–4 (2004)).

Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *See also In re Westinghouse Sec. Litig.*, 90 F.3d 696, 710 (3d Cir.1996)

(explaining that Section 10(b) claims must comply with Rule 9(b)); *Denny v. Barber*, 576 F.2d 465, 470 n. 4 (2d Cir.1978) (suggesting that Rule 9(b) applies to Section 18 claims); *McHale v. NuEnergy Group*, No. 01–4111, 2002 WL 321797, at *6, 2002 U.S. Dist. LEXIS 3307, at *17 (E.D.Pa. Feb. 27, 2002) (Giles, C.J.) (discussing applicability of Rule 9(b) to common law fraud claim); *but see In re U.S. Interactive, Inc. Sec. Litig.*, No. 01–522, 2002 WL 1971252, at *19, 2002 U.S. Dist. LEXIS 16009, at *60 (E.D.Pa. Aug. 23, 2002) (Giles, C.J.) (holding that "heightened pleading requirements of Rule 9(b) do not apply to claims under Section 20(a)").

The PSLRA requires a plaintiff who alleges that a defendant made an untrue statement of material fact to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1) (2004). Moreover, when the plaintiff must prove that the defendant acted with a particular state of mind, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (2004); *see In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 530–35 (3d Cir.1999) (discussing how PSLRA modified pleading requirements in securities fraud cases); *see also In re Rockefeller Center Properties, Inc.*, 311 F.3d 198, 217 (3d Cir.2002) (describing the additional "layer of factual particularity" that PSLRA requires of pleadings).

material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *In re IKON Office Solutions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002); · *see also Sowell v. Butcher & Singer, Inc.,* 926 F.2d 289, 296 (3d Cir.1991) (collapsing the first and third elements).

Here, the defendants do not dispute that the Argent Companies have adequately alleged that there were misstatements of material fact in connection with the purchase and sale of securities, so we focus only on the elements of reliance, loss, and scienter.

### 1. *Reliance*

■ "It is axiomatic that a private action for securities fraud must be dismissed when a plaintiff fails to plead that he or she reasonably and justifiably relied on an alleged misrepresentation." *Semerenko,* 223 F.3d at 178. Courts sometimes use the phrase "transaction causation" to describe the requisite reliance because a plaintiff must establish that, "but for the fraudulent misrepresentation, the investor would not have purchased or sold the security." *See Newton,* 259 F.3d at 172. Whatever the locution, "[r]eliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). A plaintiff may establish reliance either directly or presumptively. *See Semerenko,* 223 F.3d at 178 ("Recognizing that the requirement of showing direct reliance presents an unreasonable evidentiary burden in a securities market where face-to-face transactions are rare . . ., this court has adopted a rule that creates a presumption of reliance in certain cases.").

### a. *Fraud on the Market Presumption*

Although not the only situation where courts may presume reliance, *see Newton,* 259 F.3d at 174–75 (discussing the *Affiliated Ute* presumption), the parties here focus on whether the defendants' alleged "fraud on the market" for Rite Aid securities entitles the Argent Companies to a presumption of reliance.

The fraud on the market theory posits that the price of a security in an efficient market reflects all publicly available information about the security. *See Peil v. Speiser,* 806 F.2d 1154, 1161 n. 10 (3d Cir.1986). When someone makes a statement about the security that is misleading but is not yet recognized as such, the security's price will change to reflect the addition of the misleading statement to the overall mix of publicly available information about the security. Because purchasers "rely on the price as an indication of the stock's value," courts presume that purchasers rely indirectly on the misleading statement when they purchase a security in an efficient market at a price that reflects the misleading statement, even if they did not actually and directly rely on the misleading statement when they purchased the security. *Id.* at 1160–61; *see also In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1419 n. 8 (3d Cir. 1997) (sketching outline of fraud on the market theory). Ultimately, the Argent Companies are entitled to the fraud on the market "presumption of reliance if [they] bought securities in an efficient market." *Pinker v. Roche Holdings Ltd.,* 292 F.3d 361, 373 (3d Cir.2002).

■ Implicitly conceding that the Argent Companies have adequately pled that the market for Rite Aid common stock was efficient, Rite Aid argues only that plaintiffs are not entitled to the fraud on the market presumption of reliance with re-

spect to their transactions in Rite Aid convertible bonds because they have not alleged that the bond market was efficient. *See* Rite Aid Mem. Supp. Mot to Dismiss at 18–19. The complaint, however, states that "[t]he market for Rite Aid securities was at all times an efficient market," Compl. ¶ 52, and it explains that the "market for Rite Aid securities promptly digested new and current information regarding Rite Aid from all publicly available sources and reflected such information in the price of Rite Aid securities," *id.* ¶ 52(e). Like common stock, convertible bonds are securities, so we cannot agree with Rite Aid's suggestion that the complaint fails to allege that the bond market was efficient, especially when we are required to draw all inferences in the plaintiffs' favor. The Argent Companies may not be able to prove that the bond market was actually efficient, but their allegations are specific enough to survive a motion to dismiss.

■ Even though the pleading was adequate, both Rite Aid and KPMG contend that, as a matter of law, the Argent Companies are not entitled to the fraud on the market presumption of reliance because of their investment strategy. *See* Rite Aid Mem. Supp. Mot to Dismiss at 15–18; KPMG Mem. Supp. Mot to Dismiss at 23–26. In support of this argument, they

principally rely on *Zlotnick v. TIE Communications,* 836 F.2d 818 (3d Cir.1988),[10] a case that requires close examination.

In January, 1983, Albert Zlotnick sold short 1000 shares of Technicom stock "because he concluded that the stock was overvalued." [11] *Id.* at 819. Technicom's controlling shareholders later issued several misleading press releases that artificially inflated the stock's price. By March of 1983, Zlotnick decided to cut his losses by covering his short sales at the inflated price. Though Zlotnick lost about $35,000, he would have gained approximately $12,000 if he had waited until June, when Technicom released more realistic earnings estimates, to cover. *Id.* The district court concluded that Zlotnick had not sufficiently alleged reliance, so it dismissed Zlotnick's Section 10(b) claim. *Id.* at 820.

On appeal, Zlotnick argued that the district court should have presumed reliance based on the fraud on the market theory. After explaining that the fraud on the market presumption arose from a "theory of indirect actual reliance," the Court of Appeals continued:

The fraud-on-the-market theory creates a threefold presumption of indirect reliance. First, this court presumes that the misrepresentation affected the market price. Second, it presumes that a purchaser did in fact rely on the price of

---

10. The defendants also rely on *Jones v. Intelli–Check, Inc.,* 274 F.Supp.2d 615, 632–635 (D.N.J.2003), and *Camden Asset Mgmt., L.P. v. Sunbeam Corp.,* No. 99–8275, 2001 U.S. Dist. LEXIS 11022, at *46–(S.D.Fla. July 3, 2001), but these decisions are readily distinguishable. In *Jones,* the district court held that the plaintiff was not entitled to the fraud on the market presumption of reliance because he was aware of the fraud before he acquired a position in the relevant securities, but the Argent Companies claim not to have known the full extent of the defendants' alleged fraud when they acquired their positions. Defendants cite *Sunbeam* only for its unflattering

description of convertible arbitrage, perhaps because the district court's legal analysis—which centers on whether to certify a class action—focuses on matters quite dissimilar from those presented in the motions to dismiss now before us.

11. We infer that Zlotnick's complaint explained that he made the short sales "because he concluded that the stock was overvalued" because the Court of Appeals noted that it "accept[ed] the facts as presented in Zlotnick's allegations." *Zlotnick,* 836 F.2d at 819.

the stock as indicative of its value. Third, it presumes the reasonableness of that reliance. All of these presumptions are necessary to establish actual reliance.

*Id.* at 822. The court found that it would be illogical to make any of these presumption "in this case." *Id.* Zlotnick's claim that he sold short because he believed that the market overvalued Technicom stock could not be reconciled with the fraud on the market theory's requirement that a stock must trade on an efficient market that incorporates all available information into price.[12] Although Zlotnick was not entitled to the fraud on the market presumption, the Court of Appeals reversed the district court's dismissal and remanded the case so that Zlotnick would have an opportunity to prove actual, direct reliance. *Id.* at 824.

■ Defendants read *Zlotnick* as establishing a *per se* rule that short sellers—or even arbitrageurs—are not entitled to the fraud on the market presumption of reliance, but we do not understand the case to stand for such a broad proposition. The Court of Appeals carefully limited its holding to the allegations in the complaint before it, and the critical allegation—that Zlotnick sold Technicom shares short be-

cause he believed they were overvalued—has no analogue in the complaint here. In short, *Zlotnick* held only that a plaintiff who sells short because he believes that a stock is overvalued is not entitled to the fraud on the market presumption.[13] *See also In re Western Union Sec. Litig.,* 120 F.R.D. 629, 637 (D.N.J.1988) (Gerry, C.J.) ("*Zlotnick* concerned a short sale of stock, where the point of selling a stock is that the seller believes the price of that stock overestimates its true value, *i.e.,* that the market price is *not* an accurate valuation. Such is hardly the case in the instant action, where plaintiffs charge in part that they *did* rely on the market price when purchasing their stock to reflect its actual value."). Because the Argent Companies allege that they sold Rite Aid stock short as a hedge against potential declines in convertible bond prices, *see* Compl. ¶ 47, we decline to hold that they are not entitled to the fraud on the market presumption of reliance as a matter of law.

To summarize, we hold that *Zlotnick* does not require us to withhold from the Argent Companies the benefit of the fraud on the market presumption of reliance. They have adequately pled that Rite Aid securities traded in efficient markets, so they are, for now, entitled to that presumption. Thus, we shall not dismiss the

---

**12.** Still, the Court of Appeals implied that it would not decline to apply the fraud on the market presumption in every case that involved short sales. *See id.* at 824 ("It is only logical to hold that the same price which may communicate a misrepresentation to the traditional investor may also communicate a misrepresentation to the short seller.").

**13.** It has not escaped our attention that our reading of *Zlotnick* raises troubling questions about that decision. For example, *Zlotnick's* reasoning would lead to the conclusion that a plaintiff who bought stock believing that it was undervalued—like Zlotnick, who sold short because he believed that stock was overvalued—would not be entitled to the fraud on the market presumption of reliance. Because

all rational investors purchase and sell securities when they believe that they can make profits because the securities are either undervalued or overvalued, the reasoning of *Zlotnick,* as we have explained it, would effectively eviscerate the fraud on the market theory of presumptive indirect reliance that the Court of Appeals recognized in *Peil v. Speiser,* 806 F.2d 1154, 1161 (3d Cir.1986), and again acknowledged in *Zlotnick,* 836 F.2d at 821–822. Of course, we are bound to follow a Court of Appeals decision, even if we believe that it is wrongly decided, but we believe that our interpretation of *Zlotnick* is fully consistent with the contradictions we have noted in the decision itself.

Section 10(b) claim for failure to plead presumptive reliance. The defendants will have ample opportunity to rebut the presumption of reliance with a "showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Basic*, 485 U.S. at 248, 108 S.Ct. at 992; *see also Semerenko*, 223 F.3d at 179 n. 7 (3d Cir.2000) (discussing how defendants may rebut the presumption of reliance).

### b. *Direct Reliance*

▪ Even if Rite Aid and KPMG were correct that the Argent Companies are not entitled to the fraud on the market presumption of reliance, we would not dismiss the Section 10(b) claims unless they also failed to plead direct reliance adequately.[14]

The complaint clearly explains that the Argent Companies "carefully assessed Rite–Aid's creditworthiness ... through an evaluation of, *inter alia*, the Company's financial results, including its financial and operating performance, as reported in the Company's 10–K and quarterly filings with the SEC." Compl. ¶ 50; *see also id.* ¶¶ 63–188 (specifying—sometimes in excruciating detail—the statements on which the Argent Companies relied). Based on their analysis of these materials, plaintiffs decided to invest in Rite Aid securities. *See id.* ¶ 44. If they had "been aware of Rite Aid's true financial condition," they "would not have engaged in any transactions in Rite Aid securities whatsoever and/or would not have engaged in these transactions at the prices at which they did." *Id.* ¶ 51.

Still, Rite Aid advances four reasons why the complaint's allegations of direct reliance are insufficient. First, it claims that the Argent Companies have not pled direct reliance because these allegations are "inconsistent with plaintiffs' stated investment strategy, which had nothing to do with the fundamentals [of] the Company." Rite Aid Mem. Supp. Mot. to Dismiss at 19. This argument, however, suffers from a fatal defect: it relies on the Argent Companies' "stated investment strategy" while ignoring their actual "statement" of that strategy. The complaint clearly explains that "convertible arbitrageurs pursue a strategy, but such a strategy depends upon materially accurate financial disclosure." Compl. ¶ 45. In view of this allegation, Rite Aid's claim that the Argent Companies' "stated investment strategy" does *not* depend on accurate financial information simply errs.

Rite Aid also points out that the Argent Companies' alleged investment strategy involved selling common stock short and that they stopped making short sales "after January 1999." Rite Aid Mem. Supp. Mot. to Dismiss at 21. Because plaintiffs only allege direct reliance in connection with their stated strategy and because they stopped engaging in that strategy by early 1999, Rite Aid contends that they have failed to plead direct reliance with respect to any transactions that occurred after August of 1999. *See id.* at 20–21. This argument fails for two reasons. First, the Argent Companies *did* engage in short sales in October of 1999, *see* Compl. Ex. A, so Rite Aid's argument begins from a faulty premise. Second, we infer that decreased frequency of short sales after Jan-

14. Although a plaintiff need only plead direct reliance, a defendant may, as an affirmative defense, later prove that the plaintiff's reliance was not reasonable. *See Straub v. Vaisman and Co.*, 540 F.2d 591, 598 (3d Cir.1976) (listing "fiduciary relationship, opportunity to detect the fraud, sophistication of the plaintiff, the existence of long standing business or personal relationships, and access to the relevant information" as matters worthy of consideration in the reasonableness inquiry).

uary of 1999 is the logical outgrowth of—and is not at all inconsistent with—the Argent Companies' explanation of their convertible arbitrage strategy.[15] Although the complaint does not explicitly harmonize its description of convertible arbitrage with the Argent Companies' sporadic 1999 short sales, we must give plaintiffs the benefit of every reasonable inference. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts Inc.*, 140 F.3d 478, 483 (3d Cir.1998).

■ Rite Aid's third argument is that—especially with respect to the transactions that they completed after August, 1999—the Argent Companies have "fail[ed] to link each alleged purchase or sale to an alleged misrepresentation." *See* Rite Aid Reply at 6 (quoting *Glaser v. Enzo Biochem, Inc.*, 303 F.Supp.2d 724, 750 (E.D.Va.2003)). While Rule 9(b) clearly requires the Argent Companies to state their claims "with particularity," we believe that *Glaser's* "linking" rule imposes a pleading requirement that the purposes of the Rule cannot justify.[16] In this case, Rite Aid has received notice of a non-frivolous claim based on misrepresentations that it has already admitted, and the Argent Companies have alleged that they actually and directly relied on those misrepresentations when they traded in Rite

Aid securities. Requiring plaintiffs to link particular misrepresentations with particular trades in their allegations of direct reliance would impose additional burdens without significantly improving the quality of notice to defendants and without affording much added protection from reputation-endangering and extortionate frivolous suits. Thus, we decline to follow *Glaser's* holding.

Finally, Rite Aid suggests that the Argent Companies could not have actually relied on its financial statements after September 22, 1999, because Rite Aid had already restated its earnings once and had cancelled a meeting with analysts. Rite Aid Mem. Supp. Mot. to Dismiss at 21–22. Recently, our Court of Appeals rejected a similar argument, finding that "although the truth about [defendant's illegal activities] might have *begun* to emerge" before the plaintiff purchased securities, "the full extent of [its] illegal activities was not disclosed" until after the plaintiff had purchased them. *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 (3d Cir.2002). Argent's case is indistinguishable from *Pinker* because, although Rite Aid had partially disclosed its alleged fraud before September 22, 1999, it did not advise investors not to rely on any of its previous disclosures until November 10, 1999.

---

**15.** The complaint explains that the price of a convertible bond reflects both the straight-bond value and the conversion value. The Argent Companies' convertible arbitrage strategy involved the short sale of Rite Aid stock as a hedge against declining conversion value of the convertible bonds. When conversion value reaches zero, however, hedging—and thus short selling—becomes unnecessary. Conversion value equals zero when the cost of exercising the bonds' conversion option equals or exceeds the common stock price because an investor could acquire common stock more cheaply on the market than she could by exchanging her convertible bonds. Because it is possible that Rite Aid's stock price fell below the cost of exercising the conversion option, we can infer that the Argent Companies may have continued to engage in convertible arbitrage throughout 1999, even though they ceased selling Rite Aid stock short.

**16.** Our Court of Appeals has explained that "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir.1997).

In short, Rite Aid has not suggested any persuasive reason for us to conclude that the Argent Companies have failed to plead direct reliance with the particularity required by Rule 9(b). Thus, we hold that the complaint alleges that plaintiffs actually and directly relied on the defendants' statements with sufficient specificity to survive a motion to dismiss.

### 2. Loss

■ Just as one must plead reliance on the defendant's misstatement, the "plaintiff must establish ... that plaintiff's reliance on defendant's misstatement caused him or her injury" to survive a motion to dismiss a Section 10(b) claim. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir.1997). This "loss" element consists of two parts. First, the plaintiff must allege that he or she suffered economic loss. "If economic loss is evident, then plaintiff must prove a 'sufficient causal nexus between the loss and the alleged [nondisclosure].' " *Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 177 (3d Cir.2001)· (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir.2000)). That is, the plaintiff must also plead loss causation.

### a. Economic Loss

■ Because plaintiffs cannot recover when they have not been injured, "[f]ailure to show actual damages is a fatal defect in a Rule 10b–5 cause of action." *Newton*, 259 F.3d at 177–78 (quotation and citation omitted). The traditional measure of damages—and the measure that the Argent Companies seek to recover, *see* Pls.' Supplemental Mem. at 2—is the "out-of-pocket" rule. *Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 297 (3d Cir.1991). According to this rule, a plaintiff's damages are equal to the difference between what it paid to purchase securities and how much it received when it sold those securities.[17] *See In re Cendant Corp. Litig.*, 264 F.3d 201, 242 n. 24 (3d Cir.2001).

Applying the out-of-pocket rule is fairly straightforward when a plaintiff purchases and sells the same number of shares in only two transactions. For example, if Shannon Shareholder purchased 100 shares of Dirty Drugs stock at a price of $5 per share on January 1 and sold those shares for $3 per share on February 1, then his out-of-pocket loss would be $200. If he sold the 100 shares for $7 each on February 1, then Shannon would turn a tidy $200 profit, and he would have no claim against Dirty Drugs, even if, with scienter, it had made material misrepresentations upon which he relied.

The hypothetical becomes more complex, but not particularly problematic, when there are multiple sales that all generate either gain or loss. For instance, suppose that Shannon sold 50 of his Dirty Drugs shares for $4 per share on January 15 and the remaining 50 shares for $3 per share on February 1. He would have lost $50 on the January 15 sale and $100 on the February 1 sale, for a total loss of $150. Without too much trouble, one can imagine a parallel scenario in which Shannon enjoyed a profit.

**17.** Analogously, out-of-pocket damages from a short sale equal the difference between the amount for which an investor sold shares short and the amount spent to repurchase the covering shares. Though our discussion will focus on the purchases and sales of stock, it applies fully to short sales and covering purchases as well.

The PSLRA modified the "traditional" out-of-pocket rule (for investors who purchased securities and for those who sold short) by introducing a "mean trading price" into the calculation of damages, *see* 15 U.S.C. 78u–4(e) (2004), but our discussion does not require a careful parsing of that statutory change.

Shannon would have greater difficulty, however, when some of his sales generated a gain and some generated a loss. In this iteration, imagine that Shannon still sold 50 of his shares for $4 per share on January 15, for a $50 loss, but Dirty Drugs's share price then began to rise. When Shannon sold the remaining 50 shares on February 1, they were able to fetch $6 each, and Shannon realized a $50 gain. The $50 gain from the February 1 sale would offset the $50 loss from the January 15 sale, so Shannon would have suffered no total loss. Despite the fact that there was no total loss, can Shannon recover the $50 that he lost from the January 15 sale?

 Everyone can agree that a Section 10(b) claim does not lie when there is no loss, but the question posed by the Dirty Drugs hypothetical is how we should determine when there is a loss. We could use a "cumulative" methodology that includes offsetting gains in its loss calculation, but, for the reasons that follow, we prefer a "transaction-based" methodology that allows claims for unprofitable transactions (assuming that plaintiffs have adequately alleged the other elements of a Section 10(b) claim) without offsetting the recoverable loss with gains from profitable transactions.[18]

The language of Section 10(b) and Rule 10b–5 is more consistent with a transaction-based methodology than a cumulative one. Both provisions make it illegal for someone to make materially misleading statements "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b) (2004); 17 C.F.R. § 240.10b–5 (2004). By using the singular nouns "pur-

chase" or "sale", Congress and the SEC focus on each transaction individually. Neither the statute nor the Rule authorize any sort of aggregation of purchases or sales that could sanction the cumulative approach.

The Court of Appeals has also approved of disaggregation. In one case, a district court had decided not to certify a putative class's Section 10(b) claim, in part, because it found that "the question of economic loss remained unique to each investor." *Newton*, 259 F.3d at 179. The Court of Appeals "agree[d] with the District Court's finding that plaintiffs' claims would require individual treatment to determine actual injury." *Id.* To be sure, the court did not address whether that "individual treatment" should proceed according to a cumulative or a transaction-based methodology, but its statement does reflect concern that aggregation could obfuscate the identification of where economic loss occurs.

We also prefer the transaction-based methodology because we see no principled limits to the aggregation implicit in a cumulative methodology. If we were to aggregate profitable and unprofitable transactions, we would have to identify which transactions to aggregate. To return to our hypothetical, how would we proceed if Shannon lost $200 on other transactions in September and gained $100 on October transactions. Would we aggregate the September and October transactions? If so, could we also aggregate them with the January and February transactions? There is no limit to the possible combina-

---

18. Of course, a single transaction is neither profitable nor unprofitable by itself. Only when one transaction (purchase or sale) is "matched" with a corresponding transaction (sale or purchase) can the investor realize a gain or loss. Throughout our discussion, we use "profitable transaction" to refer to a sale of a bond for more than its purchase price and/or a covering purchase of stock for less than it was sold short. An "unprofitable transaction" means a sale of a bond for less than its purchase price and/or the covering purchase of stock for more than it was sold short.

tions, and—more importantly—no justifiable way to select the appropriate one.

We are aware that a transaction-based methodology generates higher calculated damages than a cumulative methodology because the former ignores profitable transactions and the latter includes them to offset unprofitable transactions, but this feature is not indefensible. If one conceptualizes every multiple-share transaction as multiple single-share transactions, then any apparent unfairness to defendants dissipates. Returning to the Dirty Drugs hypothetical, we described Shannon Shareholder as purchasing 100 shares on January 1, selling 50 shares on January 15, and disposing of the other 50 shares on February 1. We could have described the January 1 transaction as two purchases of 50 shares each. We also might have said that Shannon disposed of one of these 50–share blocks for a $50 loss on January 15, and he disposed of the other 50–share block for a $50 gain on February 1. This conception of Shannon's transactions reflects the underlying economic realities as completely as our original description of a single 100–share purchase, but it clarifies our conclusion. Shannon is entitled to recover his $50 loss of January 15 because that loss was attributable to his purchase and sale of 50 identifiable shares. It would be inequitable to deprive him of any recovery because his purchase and sale of 50 *different* shares happened to be profitable.

For all of these reasons, we hold that a transaction-based methodology should be used to determine whether the Argent Companies suffered an out-of-pocket economic loss. Thus, we shall dismiss those parts of the Section 10(b) claims based on profitable transactions.

### b. *Loss Causation*

■ In addition to alleging economic loss, a plaintiff must allege loss causation to satisfy the loss element of a valid Section 10(b) claim. "Loss causation demonstrates that the fraudulent misrepresentation actually caused the loss suffered." *Newton,* 259 F.3d at 173. Though our Court of Appeals has held that a plaintiff may establish loss causation by proving that he purchased a security at a market price that was artificially inflated due to a fraudulent misrepresentation, *see Scattergood v. Perelman,* 945 F.2d 618, 624 (3d Cir.1991), the plaintiff will not have shown loss causation if he sold the security before public disclosure of the misrepresentation caused the price to decline, *see Semerenko v. Cendant Corp.,* 223 F.3d 165, 185 (3d Cir.2000) ("In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price.").

Between September 4, 1997 and September 21, 1999, the Argent Companies allege that the price of Rite Aid securities reflected the defendants' misrepresentations about Rite Aid's financial condition. Although they traded heavily in Rite Aid securities during this period, the misrepresentations did not begin to become incorporated into the securities' prices until September 22, 1999, the date when Rite Aid cancelled a meeting with analysts. Because the misrepresentations could not have affected price until then, the Argent Companies have not alleged that the defendants' misrepresentations were the legal cause of their losses on their pre-September 22, 1999 transactions.[19] Thus, we shall dismiss the parts of the Section

---

**19.** The Argent Companies do not dispute this conclusion. *See* Pls.' Mem. Opp'n Rite Aid

Mot. to Dismiss at 19 n. 20.

10(b) claims that are based on those transactions.[20]

■ KPMG contends that the Argent Companies cannot demonstrate that KPMG's misrepresentations caused the losses that arose after September 21, 1999 because KPMG did not report on the "most recent" financial statements available at those times. KPMG Mem. Supp. Mot. to Dismiss at 29–35. This argument ignores that the market price of Rite Aid securities reflected all of the information in the statements that KPMG had audited until Rite Aid, on November 10, 1999, warned analysts not to rely on them. KPMG is correct that prices also reflected the information about fiscal year 2000, but the addition of these data did not make the 1997, 1998, and 1999 statements irrelevant. Rather, an investor interpreting the 2000 data would necessarily rely on the earlier statements to determine whether Rite Aid's financial position was improving or deteriorating. Because the complaint, read in the light most favorable to the Argent Companies, supports the inference that they continued to rely on the financial statements that KPMG had audited to provide context for the fiscal year 2000 state-ments, the Argent Companies have pled that KPMG contributed to the losses that they realized after September 21, 1999.

### c. Second Supplemental Memorandum

As we have already explained, the Argent Companies have failed to plead economic loss from their profitable transactions, and they have failed to plead loss causation for the transactions that occurred before September 21, 1999. Thus, we shall dismiss the parts of their Section 10(b) claims that relate to those transactions.

To identify the transactions for which the Argent Companies cannot recover, we directed the Argent Companies to submit a Second Supplemental Memorandum ("Memorandum") analyzing the 126 transactions on which they realized a gain or loss between September 5, 1997 and December 31, 1999 [21] using a transaction-based methodology. Though they draw different inferences from the Memorandum's calculations, the defendants have not challenged the accuracy of those calculations, and we have verified many of those calculations.[22] The Memorandum reveals

---

**20.** Save two, all of the pre-September 22, 1999 transactions also occurred before March of 1999. The two exceptions are Argent's March 24, 1999 purchase and sale of convertible bonds with a face value of $9,720,000 and its March 24, 1999 short sale and covering purchase of 107,600 shares of Rite Aid stock. Because the complaint does not allege that the public learned of any misrepresentations on March 24, 1999, we would dismiss the parts of the Section 10(b) claim based on the March 24, 1999 transactions, even if we took March 12, 1999—the date when Rite Aid announced that its earnings would not meet analysts' expectations—rather than September 22, 1999, as the date when Rite Aid's misrepresentations first began to emerge.

**21.** Argent realized neither a gain nor a loss on one of these 126 transactions, its September 5, 1997 sale of convertible bonds with a face value of $250,000.

**22.** To date, we have discovered only two minor errors in Exhibit A to the Memorandum. First, on page 18, it reports that Argent Bermuda sold a bond with a face value of $1,065,000 on January 22, 2001. Because this sale is matched with purchases totaling face value of $1,055,000, either the purchase amount or the sale amount must be incorrect. We believe that the sale amount—rather than the purchase amount—is incorrect because the total purchase amount of bonds held through the "look back" period is $24,500,000 and the total sale amount is $24,510,000. Our independent analysis suggests that the correct total amount is $24,500,000, so the purchase amount must be correct and the sale amount must be incorrect.

The second error occurs on page 20 of Exhibit A to the Memorandum. There, and in Exhibit A to the complaint, Argent Bermuda

the following break-down of the 126 transactions by date and profitability:

| | | Loss Causation | | |
|---|---|---|---|---|
| | | 9/4/97 to 9/21/99 Transactions | 9/22/99 to 12/31/99 Transactions | Total Transactions |
| Economic Loss | Not Unprofitable Transactions | 40 | 2 | 42 |
| | Unprofitable Transactions | 73 | 11 | 84 |
| | Total Transactions | 113 | 13 | 126 |

As this table summarizes, the Argent Companies lost money on 84 of the 126 transactions, so they have failed to show economic loss for the other 42 transactions. Of the 84 unprofitable transactions, 73 occurred before September 22, 1999.

Thus, the Argent Companies have pled loss causation for only 11 unprofitable transactions that occurred between September 5, 1997 and December 31, 1999. These transactions involved the following sales of convertible bonds:

| Entity | Date of Sale | Face Amount of Bonds Sold | Loss |
|---|---|---|---|
| Argent | 12/2/99 | $ 1,000,000.00 | $ 371,250.00 |
| Argent | 12/2/99 | $ 1,081,000.00 | $ 401,825.75 |
| Argent | 12/3/99 | $ 2,000,000.00 | $ 519,000.00 |
| Argent | 12/3/99 | $ 1,000,000.00 | $ 229,420.50 |
| Argent | 12/3/99 | $ 4,000,000.00 | $1,023,887.94 |
| Argent | 12/6/99 | $ 1,000,000.00 | $ 163,777.00 |
| Argent | 12/13/99 | $ 660,000.00 | $ 59,417.82 |
| Argent Bermuda | 12/3/99 | $ 4,000,000.00 | $1,225,100.00 |
| Argent Bermuda | 12/6/99 | $ 1,000,000.00 | $ 167,000.00 |
| Argent Bermuda | 12/6/99 | $ 1,000,000.00 | $ 122,888.50 |
| Argent Bermuda | 12/13/99 | $ 840,000.00 | $ 75,622.68 |
| Total | | $17,581,000.00 | $4,359,190.19 |

To summarize, the Argent Companies have adequately pled that the defendants caused them to lose slightly more than $4.3

alleges that it made two covering purchases of a total of 152,800 shares of Rite Aid stock on July 1, 1998. The complaint indicates that Argent Bermuda paid $37.56 per share, and the Memorandum purports to use a share price of $37.56 to calculate the total expenditures. If, however, one divides the total expenditure by the total number of shares, it is apparent that Argent Bermuda actually used a price of $37.5625 in its calculations.

We recognize that these errors are not only *de minimis*, but also irrelevant to the issues raised in the motions to dismiss. We raise them now because we expect that the Memorandum will serve as a useful reference point as this case continues through discovery, settlement discussions, further motion practice, trial, and appeal. Thus, we endeavor to make it as accurate as possible.

million between September 5, 1997 and December 31, 1999.

As of December 31, 1999, the Argent Companies still held convertible bonds with a face value of $41.5 million and had yet to cover short sales of 23,700 shares of Rite Aid stock. Although the Memorandum explains that they lost slightly more than $8 million on these positions, the complaint does not allege whether they gained or lost from them. Had the defendants challenged this failure to plead economic loss with the particularity that Rule 9(b) requires, they might have prevailed. Defendants' failure to raise this issue suggests, however, that they have not suffered any prejudice from the lack of particularity, so we shall not reach out to consider dismissing *sua sponte* the portions of the Section 10(b) claims attributable to post-1999 transactions.

### 3. *Scienter*

■ As with loss and reliance, the Argent Companies must plead scienter adequately if their complaint is to survive a motion to dismiss. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381 & n. 12, 47 L.Ed.2d 668 (1976). The PSLRA "specifically requires that a securities fraud complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir.2000) (quoting 15 U.S.C. 78u–4(b)(2)). In interpreting the "strong inference" requirement, our Court of Appeals has explained that "[p]laintiffs must either (1) identify circumstances indicating conscious or reckless[23] behavior by defendants or (2) allege facts

showing both a motive and a clear opportunity for committing the fraud." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir.1997) (footnote added); *see also In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir.1999) (discussing standards for pleading scienter in light of PSLRA). Because the Rite Aid Defendants do not argue that the complaint fails to allege scienter adequately, we concentrate solely on the allegations regarding KPMG.

■ KPMG strenuously argues that the Argent Companies have not stated with particularity any facts giving rise to a strong inference that it acted with scienter, *see* KPMG Mem. Supp. Mot. to Dismiss at 35–53, but we believe that a fair reading of the complaint belies that contention. According to the complaint, KPMG assigned a new partner, Michael Hussey, to Rite Aid in early 1999, and Hussey "soon discovered ... that the KPMG workpapers for audits of prior years were grossly deficient." Compl. ¶ 124. Although KPMG usually completed its audits by the end of April, senior KPMG partners labored at Rite Aid over Memorial Day weekend to complete the fiscal year 1999 audit. *Id.* ¶ 124(d). On May 28, 1999, KPMG finally issued an unqualified opinion that Rite Aid's financial statements conformed with GAAP. *Id.* ¶ 129. Despite this opinion, later developments revealed that these statements overstated Rite Aid's earnings by $1.6 billion. *Id.* ¶ 133. On June 24, 1999, KPMG drafted a letter to Rite Aid's Audit Committee advising that it could not issue quarterly review reports until Rite Aid

**23.** Recklessness includes "[h]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Infinity Group Co.*, 212 F.3d 180, 192 (3d Cir.2000) (citing *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979)).

improved its internal controls. *Id.* ¶ 178. Plaintiffs explain that KPMG's concern about its potentially "catastrophic liability for its reckless 1997 and 1998 audits and false audit opinions" led it to issue the unqualified 1999 opinion when it knew that Rite Aid's accounting practices were seriously flawed. *See id.* ¶ 136. These flaws were so obvious that an outside consultant identified some of them "[i]n a matter of days." *Id.* ¶ 166.

The allegations that we have just rehearsed are sufficiently "particular" to satisfy the requirements of Rule 9(b) and the PSLRA. Taken together, they suggest that KPMG acted recklessly when it issued its unqualified opinion on Rite Aid's fiscal year 1999 financial statements in the face of accounting practices so flawed that KPMG itself would not issue another opinion without significant reform and so blatant that outsiders perceived them almost immediately. Moreover, KPMG, as Rite Aid's auditor, had the opportunity to make the fraudulent representations about Rite Aid's compliance with GAAP, and it had the motive to make those misrepresentations to conceal its negligent—if not reckless—conduct in previous fiscal years. In short, the Section 10(b) claim contains sufficient allegations about KPMG's scienter to survive the motion to dismiss.

### B. *Remaining Federal Claims*

In Counts 3 and 4, the complaint alleges that the defendants violated Sections 20(a) and 18 of the Act, respectively.

Section 18 of the Act "creates a cause of action for materially misleading registration statements." *Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 356 (3d

Cir.1993); *see also* 15 U.S.C. § 78r (2004). In support of their motions to dismiss the Section 18 claim, the defendants essentially reiterate their arguments about loss and reliance.[24] For the same reasons that we did not accept those arguments fully in the Section 10(b) context, and because we understand the loss and reliance elements of Sections 10(b) and 18 to be coterminous, we shall grant the motions to dismiss the Section 18 claim only to the same extent that we granted the motions to dismiss the Section 10(b) claims.

The Argent Companies also assert a claim against Grass, Noonan, and Bergonzi for violations of Section 20(a) of the Act, 15 U.S.C. § 78t(a) (2004). That section imposes joint and several liability on one who controls a corporation that violates federal securities laws. The Individual Defendants suggest that we should dismiss this claim because the Argent Companies failed to plead their other federal claims adequately and a Section 20(a) claim will not lie when there are no actionable independent underlying violations of the Act. *See In re Advanta Corp. Sec. Litig.*, 180 F.3d at 541; *see also In re Rockefeller Center Properties, Inc.*, 311 F.3d 198, 211 (3d Cir.2002) ("[I]t is well-settled that controlling person liability is premised on an independent violation of the federal securities laws."). Because we read the allegations in the complaint as sufficient to state claims for violations of Sections 10(b) and 18 of the Act, we shall not dismiss the Section 20(a) claim.

### C. *Common Law Fraud*

■ Finally, the Argent Companies assert a claim of common law fraud against

---

**24.** Additionally, KPMG argues that the Argent Companies have failed to plead scienter adequately in their Section 18 claim. *See* KPMG Mem. Supp. Mot. to Dismiss at 55. We fail to see the significance of this argument when KPMG concedes that "no showing of scienter ... is required" in a Section 18 claim. *Id.* at 54 (quoting *In re Stone & Webster, Inc. Sec. Litig.*, 253 F.Supp.2d 102, 135 (D.Mass. 2003)).

all defendants in Count 5. To survive a motion to dismiss a fraud claim, a plaintiff must plead "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882, 889, 538 Pa. 193, 207 (1994); *see also Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3d Cir.1991). The defendants believe that the fraud claim should be dismissed because it suffers from the same deficiencies as the Section 10(b) claims. *See* KPMG Mem. Supp. Mot. to Dismiss at 57. To the extent that parts of the Section 10(b) claims are adequate, however, we shall grant the motion to dismiss the common law fraud claim only in part.

*Conclusion*

Scienter, reliance, and loss are essential elements of all Section 10(b) claims. Though the Argent Companies have pled scienter and reliance adequately, parts of their Section 10(b) claims must be dismissed for failure to plead loss. Specifically, we shall dismiss those parts of the Section 10(b) claims that are based on profitable transactions and those parts based on transactions that occurred before September 22, 1999. We shall also dismiss the parts of the Section 18, Section 20(a), and common law fraud claims based on those transactions.

An appropriate Order follows.